RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0157p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

DUAN YING CHEN (04-3730); JIN HE LIN (04-3731),
*Petitioners,*

*v.*

Nos. 04-3730/3731

ALBERTO GONZALES, Attorney General of the
United States,

*Respondent.*

On Petition for Review of an Order of
the Board of Immigration Appeals.
Nos. A78 125 627; A71 488 192.

Submitted: March 15, 2006

Decided and Filed: May 10, 2006

Before: DAUGHTREY and McKEAGUE, Circuit Judges; McCALLA, District Judge.[*]

_____

### COUNSEL

_____

**ON BRIEF:** Allen W. Hausman, Joanne E. Johnson, U.S. DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. Duan Ying Chen, Jin He Lin, Westerville, Ohio, pro se.

_____

### OPINION

_____

MARTHA CRAIG DAUGHTREY, Circuit Judge. Petitioners Duan Ying Chen and her husband, Jin-He Lin, are citizens of the People's Republic of China who sought refuge in this country after Chen was allegedly forced to undergo a sterilization procedure following the birth of the couple's second child. The immigration judge and the Board of Immigration Appeals (BIA) ultimately rejected the petitioners' claims of asylum and withholding of removal, and Chen and Lin now appeal those determinations, contending that they are not supported by substantial evidence.

_____

[*] The Honorable Jon Phipps McCalla, United States District Judge for the Western District of Tennessee, sitting by designation.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Chen and Lin were married in 1985 and lived in rural Fujian Province with their son, Jin Lin, who was born on February 9, 1986. Three years later, Chen became pregnant with the couple's second child, in violation of the country's strict population control policies. The petitioners claimed that, as a result of that pregnancy, Chen was visited in January 1990 by five members of a local "cadre" while her husband was away at work. Lin arrived home to find the cadre members, four men and one woman, using force in an attempt to take Chen away to undergo an abortion. Lin pleaded with them to allow Chen to give birth to the baby because of the risks associated with performing an abortion during the sixth month of a pregnancy. When the cadre members refused to accede to Lin's request, he began pushing and shoving the officials in an attempt to keep them from forcing his wife to abort her pregnancy. During that scuffle, one of the cadre members fell off some stairs, allegedly breaking his leg in the process. Chen and Lin used the opportunity created by that commotion to run from their home in an effort to escape.

During the escape, the couple apparently left their young son, who was almost four years old, playing in the yard, confidant that neighbors would look after the boy until the petitioners' return. They then took a three-wheeled vehicle to the main road and boarded a bus that took them to Chen's parents' home approximately two hours away. The couple hid in and around that area for three months until Chen was due to deliver the baby. A second son, Bing Lin, was born on April 30, 1990.

Although Chen and the two boys continued to live openly in the family home, Lin himself did not, out of fear that local authorities would seek revenge for his actions leading to the accident with the cadre member in January 1990. Lin would, however, visit his family under the cover of night whenever possible. Eventually, the authorities learned of Chen's return to the area and visited her, assessing her a fine for the unauthorized birth of a second son and demanding that she undergo surgical sterilization. The procedure was not performed immediately because Chen suffered from low blood pressure. On September 18, 1992, she underwent a bilateral tubal ligation at a local hospital.

In 1993, Lin contracted with smugglers to bring him to the United States in exchange for more than $20,000 borrowed from friends, relatives, and employers who loaned money to Lin on the premise that he could make enough money in this country to repay the loans. Six years later, in 1999, Chen made arrangements with her parents to look after the couple's children, and she herself paid an even larger sum to smugglers to gain entry into this country. Both Lin and Chen were apprehended by immigration officials.

On July 6, 1993, Lin first appeared before an immigration judge in Baltimore, Maryland, represented by an attorney simultaneously serving as counsel for eight other undocumented immigrants from China. An evidentiary hearing concerning Lin's application for asylum was conducted in September 1993, at which time Lin testified that his wife had been forced to submit to sterilization after the birth of their second son. He further explained that, if made to return to China, he would be jailed and fined for having left the country illegally and might well be killed because of the large sum of money he still owed various people in China. At the conclusion of the hearing, the immigration judge issued an oral decision denying Lin's requests for asylum and withholding of deportation. Those determinations were made in the light of then-existing precedent that required a petitioner seeking asylum based upon China's coercive family planning policies to prove that the policy "will be selectively enforced against himself and his spouse for a goal other than general population control." The immigration judge also denied Lin's request for voluntary departure, noting that the petitioner "is unsure whether or not he would be able to secure the necessary funds to remove himself from the United States."

The BIA affirmed the decision of the immigration judge.  In doing so, the Board also relied upon past agency precedent in *Matter of Chang*, 20 I. & N. Dec. 38 (BIA 1989), to conclude that Lin was not eligible for asylum in the United States.  The Board further stated that "[b]ecause the respondent failed to establish eligibility for asylum, he also has failed to establish eligibility for withholding of deportation," which requires meeting an even stricter burden of proof.

Prior to Lin's actual removal from this country, Congress amended the definition of the term "refugee" in the Immigration and Nationality Act to provide, in pertinent part, that a person forced to undergo involuntary sterilization is deemed to have been persecuted on the basis of political opinion.  *See* 8 U.S.C. § 1101(a)(42).[1]  Consequently, when Lin petitioned the BIA to reopen the proceedings on his request for asylum and withholding of removal, the Board granted that request and ordered a supplemental hearing in light of the change in the law.  After Chen's entry into the United States in 1999 and her detention by immigration officials, the asylum petitions of the couple were consolidated for a hearing held on May 1, 2001, this time in Detroit, Michigan.  At the close of the hearing, the immigration judge issued an extensive written decision questioning the credibility of petitioners Chen and Lin on numerous bases.  Finding that the couple's lack of credibility went to the heart of the asylum claim, the judge denied the requests of both Chen and Lin for asylum, withholding of removal, and voluntary departure.  The judge further entered a finding that Lin's application was frivolous.

The BIA dismissed the petitioners' appeal as untimely, but later granted a motion to reopen the period to perfect the administrative appeal in light of the admitted deficiencies on the part of the attorney for Chen and Lin.  After accepting the appeal, the Board nevertheless affirmed the decision of the immigration judge without a separate opinion.  This petition for review of the Board's decision ensued.

## II.  DISCUSSION

Before this court, Chen and Lin contest the immigration judge's determination that they were not entitled to a grant of asylum or to the withholding of deportation.  They also contend that the judge's finding that Lin's application was frivolous is not supported by the facts adduced at the evidentiary hearing.

## A.  Refugee Status

Pursuant to the provisions of 8 U.S.C. § 1158(b)(1), the attorney general may grant asylum to an applicant determined to be "a refugee within the meaning of section 1101(a)(42)(A) of [title 8]."  That statutory subsection defines a "refugee" to mean

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

Moreover, subsection (a)(42) states:

---

[1]Additionally, the government does not contest and, indeed, has conceded in other cases "that the spouse of a woman who has been forced to undergo [a] . . . sterilization procedure can thereby establish past persecution." *In re C-Y-Z-*, 21 I. & N. Dec. 915, 918 (BIA 1997).

> For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

Thus, resolution of any request for asylum involves "a two-step inquiry:  first, whether the petitioner is a 'refugee' within the meaning of the statute, and second, whether the petitioner merits a favorable exercise of discretion by the Attorney General." *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.5 (1987)).

## B.  Standard of Review

When, as in this case, the BIA summarily affirms the decision of an immigration judge without issuing its own opinion, "we review the [immigration judge's] decision as the final agency decision." *Denko v. INS*, 351 F.3d 717, 726 (6th Cir. 2003).  We must sustain a decision by the immigration judge denying asylum if that determination is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).  As we have recognized, "[u]nder this deferential standard, we may not reverse the [immigration judge's] determination simply because we would have decided the matter differently." *Koliada v. INS*, 259 F.3d 482, 486 (6th Cir. 2001); *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998).  Rather, to overturn an immigration judge's ruling "we must find that the evidence not only *supports* [a contrary] conclusion, but *compels* it." *Elias-Zacarias*, 502 U.S. at 481 n.1 (emphasis in original).

## C.  Credibility Determinations By Immigration Judge

The decision by the immigration judge to deny the petitioners' requests for asylum was driven by her conclusion that Chen and Lin were not credible witnesses.  A credibility determination is considered a finding of fact and is reviewed under the deferential substantial evidence standard. *See Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004).  Even so, the immigration judge's conclusion must be supported by specific reasons and must be based upon issues "that go to the heart of the applicant's claim." *Id.* at 926.  In other words, "[i]f discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility." *Id.* (citations and internal quotation marks omitted).

In her written opinion denying the petitioners' applications, the immigration judge relied upon several general findings to support her conclusion that Chen and Lin were not credible witnesses.  She first discounted the evidentiary value of the documentation submitted by the couple in support of their applications by pointing out that Exhibits R-3 and R-4 (purportedly certificates verifying the birth dates of Jin and Bing Lin) were prepared by government officials without "investigation of the truth or veracity of the claims made, at least none that the witness was aware of."  The immigration judge further explained "that field investigations ordinarily are made with respect to this, and the female respondent has testified that she was unaware of any field investigation being made."

The fact that Chen was unaware of any field investigation being conducted by Chinese government officials does not, of course, mean that no such investigation occurred.  In fact, the probable veracity of exhibits R-3 and R-4 is enhanced by reference to official United States reports on the situation in the province of China from which the petitioners came.  In the 1998 *Profile of*

*Asylum Claims and Country Conditions* for China prepared by the United States Department of State, our own government notes:

> A Chinese official with responsibilities relating to notarial offices in Fujian province has told the U.S. Consulate in Guangzhou that no reliable documents existed to prove relationships and that notaries must do field investigations to confirm information in notarial documents. (If no contradictory information is discovered, notarial certificates are then issued.)

Exhibits R-3 and R-4 are not designated as mere "notarial documents." Rather, both exhibits are termed "notarial certificates," the same designation given by the State Department report to documents issued after "no contradictory information is discovered" in a field investigation. Given the recognition "that no reliable documents existed to prove relationships" in Fujian province, no substantial evidence – indeed no evidence at all other than the fact that many such documents have been fabricated in the past – supports the immigration judge's conclusion that these documents were not authentic.

The immigration judge also referred to another portion of the 1998 State Department report on China and concluded that Chen and Lin must be lying about their past because their stories are similar to fabrications offered by other individuals seeking asylum in this country. In the report, the State Department explained:

> Ninety percent of the asylum claims received by the Department of State come from Fujian province. The following observations, taken from trips spanning the period from 1992 to 1997, supplemented by many interviews in Guangzhou of families following to join asylees, are intend [sic] to provide insight into the way that the Chinese family planning policy is implemented in that area.
>
> These are among elements common in claims from Fujianese:
>
> [1]     that a wife was ill and could not undergo sterilization, so the husband was chosen to have the procedure;
>
> [2]     that a couple violated birth control regulations by adopting a foundling, who, the officials charged, was the couple's natural child;
>
> [3]     that a couple had left inadequate spacing between children;
>
> [4]     that an applicant got into a physical fight with aggressive birth control officials (this is a claim that appears frequently in applications by young unmarried applicants who say they were protecting their relatives);
>
> [5]     that houses were damaged by angry birth control officials;
>
> [6]     that children over the limit were born after sterilization procedures were faked or that IUD's were surreptitiously removed to permit new pregnancies;
>
> [7]     that a wife had to leave her home area to avoid her pregnancy being discovered by officials, or;

[8]     that zealous birth control officials tried to impose fines that were allegedly so high that the applicant and his family were unable to pay.

In her opinion, the immigration judge cast doubt upon the truthfulness of the petitioners' claims because Chen and Lin offered a narrative that included elements [1], [4], [7], and [8] from the State Department report. In reality, however, the account of their ordeal offered by the petitioners differed from the elements listed above to various degrees. For instance, Chen did *not* claim to have been ill so as to have Lin chosen for sterilization; rather, she herself was always targeted for sterilization. Indeed, her husband was in hiding at that time and could not be located by the authorities. Next, although Lin did claim to engage in a shoving match with cadre members, the couple was *not* unmarried at the time as the report suggested would be the case. Also, Chen did leave her home prior to the birth of her second son, but that flight was *not* to conceal the pregnancy from officials; in fact, the petitioners related that the cadre was already aware of the pregnancy and that Chen and Lin fled only to escape a forced abortion of that pregnancy. Finally, even though Lin did indicate that he and his wife had been fined for having a second, unauthorized child, even the government agrees that the fine must not have been too exorbitant and that the petitioners themselves claimed to have paid off the assessed fine.

An examination of the actual claims made by the petitioners thus indicates that the accounts offered by Chen and Lin did not fall neatly into the formulaic recitations of which the immigration judge was so wary. In any event, and more significantly, the State Department report specifically noted, after listing the common elements of often-fabricated claims, that "[t]here is confirmation from various sources that each of these types of events occur. However, reporting by the Consulate General in Guangzhou raises doubts that they have occurred with the frequency asserted by asylum applicants from Fujian province." Because the United States government itself admits that each of the events found suspect by the immigration judge do indeed occur in Fujian province, the judge should not have so cavalierly dismissed the possibility that Chen and Lin were telling the truth when recounting their ordeals in their homeland. Absent some other indicia of unreliability, therefore, mere reliance upon some similarities with frequently fabricated elements of other asylum claims provides no evidence to substantiate a determination that the petitioners lacked credibility. Indeed, denying the claims of Chen and Lin solely because their story vaguely mirrored false claims of other individuals is logically equivalent to convicting a defendant of a crime simply because he or she has put forth an alibi defense, a defense that other defendants through the years have often fabricated in other situations.

In an effort to justify her credibility determinations, the immigration judge also claimed that petitioner Lin must have lied under oath during his 1993 evidentiary hearing because the testimony offered at that time was different from the testimony offered by Lin during the 2001 evidentiary hearing. Specifically, the judge noted in her written opinion that in 1993, Lin did not mention his scuffle with cadre members or the fact that a cadre member suffered a leg injury during the altercation. She also ruled that Lin was not worthy of belief because he earlier made no mention whatsoever of the family's flight from their home and instead testified that his wife was easily found by government officials because she was "at home with our two children."

In reaching her conclusion, the immigration judge may have overlooked the stark realities of the situation in which Lin found himself. At the time of the 1993 hearing, Lin was a recent arrival in this country, was personally unfamiliar with the intricacies of immigration law, and neither spoke nor understood the English language. At the administrative hearing, therefore, he found himself at the mercy of his attorney and the representative of the United States government that was attempting to remove him from this country. Throughout the 1993 hearing, Lin answered all the questions posed him, none of which called for him to elaborate on or even mention the confrontation with and flight from Chinese population control officials. Nevertheless, on two occasions during that

questioning, petitioner Lin did mention that government officials were looking for his wife during her pregnancy. Such statements could easily have served as a springboard for inquires into the circumstances surrounding the fact that petitioner Chen was not in the area where she could be located easily. In both instances, however, the questioning then veered from that topic and focused upon other considerations. Hence, Lin may well have been thwarted in any effort he could reasonably make to discuss the facts that the immigration judge felt were so essential to establishing his credibility before the immigration court.

Moreover, the fact that Lin's attorney at the 1993 hearing did not elicit testimony concerning his client's scuffle with cadre members in 1990 should not be considered evidence of any lack of credibility on the part of the petitioner. At the 1993 hearing, Lin based his claim for asylum solely upon the 1992 forced sterilization of his wife. The circumstances surrounding Chen's pregnancy thus were of only background interest to the actual issue then before the immigration judge.

Similarly without import to the issue of Lin's credibility is the judge's insinuation that Lin and Chen could not have fled from government officials during Chen's pregnancy because Lin "to the contrary states that his wife was easily found because, 'We were at home with our two children.'" In coming to that conclusion, the immigration judge mistakenly confused Lin's testimony regarding his and his wife's flight from their home during the sixth month of Chen's pregnancy in January 1990 and testimony that government officials located Chen at her home in 1992 for the forced sterilization. Obviously, this non-discrepancy in testimony cannot support the adverse credibility determination made by the immigration judge in this matter.

As an additional basis for her conclusion that the petitioners were not credible witnesses, the immigration judge pointed to the fact that Lin's 1993 asylum application indicates that he did not know the birth dates of his two sons. She also concluded that the petitioner must be lying about the facts underlying his claim because a later 1998 application lists only Jin Lin as a son and not both Jin and Bing Lin. Moreover, the 1998 application lists Jin's birth date as April 30, 1990, which is actually Bing Lin's birth date. A mix-up in recording the dates of the children's births is not, however, germane to the crucial issue in this case – whether Lin's wife was forced to undergo a sterilization procedure following the birth of her second child. In the 1993 application, moreover, Lin did list the names of his sons, mentioned in narrative form that he and his wife had both a nine-year-old child and a four-year-old child, and stated that "[a]fter the birth of our second child, my wife was forced by the local government to undergo sterilization in 1992." Both Lin and Chen were unwavering in their testimony in the various hearings regarding the salient facts of their asylum applications. Any error in supplying or in recording the birth dates of the two children in no way alters this truth.

Likewise, the failure of the petitioner to list his second child at one point on the 1998 application has no significant bearing on Lin's credibility. Lin, who speaks – and presumably writes – no English, obviously did not fill out the forms questioned by the immigration judge and may have been unable to verify their completeness or accuracy prior to their filing with the immigration court. In any event, the 1998 application, although listing only one child of the petitioner couple, does speak, in narrative form, of the existence of *two* children. More importantly, at no time during any of the numerous hearings in these matters did either petitioner Lin or petitioner Chen give any indication that they had any more or any fewer than two children. The immigration judge's attempt to create an inconsistency in this matter borders on the disingenuous.

Next, the immigration judge cast doubt upon the credibility of the petitioners because Chen, although living in the United States for two years prior to the final evidentiary hearing, failed to obtain "evidence of sterilization from a reputable doctor in the United States." Although the burden of proving that she is deserving of a grant of asylum rests with the petitioner, *see* 8 C.F.R. § 208.13(a) (2005), there is nothing in the relevant case law or regulations that requires a second

opinion as to the very fact of sterilization. In fact, the Attorney General's own regulations provide that "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." *Id.* Here, however, Chen has offered as evidence of her sterilization not only her own sworn testimony, but also a surgery certificate from the Fuzhou Suburban Hospital, an X-ray and X-ray reports of a bilateral tubal ligation, and photographs showing a surgical scar from the operation. Chen's failure to obtain yet additional verification of the sterilization procedure from a doctor in this country (although she has since done so) cannot reasonably provide a basis for a finding that the petitioners were otherwise not worthy of belief.

Finally, the immigration judge suggested that inconsistencies in the stories of the husband and wife concerning their contact with and escape from the cadre members in January 1990 provide further evidence that the petitioners were not credible. The details highlighted by the judge do not, however, enhance or detract from the claims of persecution made by Chen and Lin. For example, whether the couple escaped on a three-wheeled, man-powered vehicle or a three-wheeled, motorbike cannot strengthen or weaken the petitioners' claim. Any such inconsistencies, therefore, have no bearing on the petitioners' credibility. *See Sylla*, 388 F.3d at 926.

In summary, we conclude that none of the designated bases for the immigration judge's credibility determination in this matter is supported by substantial evidence in the record. Indeed, in our view the administrative record compels a conclusion contrary to that reached by the immigration judge.

## D. Finding That Lin's Application Was Frivolous

In 8 C.F.R. § 208.20 (2005), the Department of Homeland Security has provided that an immigration judge may find an asylum application to be frivolous "if any of its material elements is deliberately fabricated. Such finding shall only be made if the immigration judge or the Board is satisfied that the applicant, during the course of the proceedings, has had sufficient opportunity to account for any discrepancies or implausible aspects of the claim." In this matter, the immigration judge concluded that Lin's May 2001 application for asylum was frivolous "[g]iven the fact that we have prior sworn testimony in this case which is so inconsistent and so widely differential from that proffered in this case." She continued by stating "that [Lin] has proffered both documents, statements, and testimony which appear to be fabricated and testimony which is certainly not plausible, consistent, or believable." In light of the preceding discussion of the immigration judge's credibility determinations, however, we conclude that the administrative record before us contains no support for the conclusion that Lin's application was "frivolous," as defined by the applicable regulation.

## III.  CONCLUSION

When a court "reverses an adverse credibility finding, 'remand to determine whether [the petitioner] qualifies as a refugee is the appropriate remedy.'" *Pergega v. Gonzales*, 417 F.3d 623, 630-31 (6th Cir. 2005) (citation omitted). Because the record not only fails to support the conclusion that petitioners Lin and Chen were unworthy of belief but actually compels a contrary conclusion, we GRANT the petition for review and REMAND this matter to the BIA with directions to return the case to the immigration court, preferably before a different judge, for reconsideration and for any further proceedings that may be considered necessary and consistent with this opinion.