NOT RECOMMENDED FOR PUBLICATION
File Name: 07a0417n.06
Filed: June 19, 2007

No. 06-3558

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

VASILI VAKHTANG BESHKENADZE and)
JULIYA VICTOROVNA KOVALEVA,     )
                                )
        Petitioners,            )
                                )
v.                              )     ON APPEAL FROM THE BOARD OF
                                )     IMMIGRATION APPEALS
ALBERTO R. GONZALES, Attorney General)
of the United States,           )
                                )     OPINION
        Respondent.             )
                                )

Before:  GUY, BATCHELDER, and GILMAN, Circuit Judges.

**RONALD LEE GILMAN, Circuit Judge.**  Vasili Vakhtang Beshkenadze, a native of the

Republic of Georgia, and his wife Juliya Victorovna Kovaleva, a native of Russia, entered the United

States as nonimmigrant visitors in the late 1990s.  Both overstayed their government-authorized

welcome.  Beshkenadze filed an application for asylum, withholding of removal, and protection

under the Convention Against Torture (CAT) for both him and his wife in August of 2000, but the

application was inexplicably not processed by the government for several years.  Following a merits

hearing in late 2004, an Immigration Judge (IJ) denied the petitioners' request for relief and ordered

them removed.  The Board of Immigration Appeals (BIA) summarily affirmed the IJ's decision

without opinion, stating only that the IJ's factual findings were not clearly erroneous. Beshkenadze and his wife timely petitioned for review. For the reasons set forth below, we **DENY** their petition.

## I. BACKGROUND

**A.** **Factual background**

As grounds for asylum, Beshkenadze's application alleged what he describes as two "cycles" of persecution in his life. Each of the cycles, which were separated by a quarter of a century, revolved around Beshkenadze's Jewish heritage as well as his childhood neighbor, Gocha Tedviashvili.

The first cycle dates to Beshkenadze's teenage years in the 1970s, when Tedviashvili and his cohorts allegedly tormented Beshkenadze at school for being Jewish. According to Beshkenadze, this tormenting occasionally erupted into violent, "savage" acts. Among these was a chase of Beshkenadze by a "student mob" that ended in his jumping from one building to another and "sustaining a severe kidney injury that required extensive surgery." He also alleges that Tedviashvili killed Beshkenadze's puppy by hanging it in plain view "and then taunted Mr. Beshkenadze with anti-Semitic epithets as he gazed upon that atrocity."

The second cycle of alleged persecution dates to Beshkenadze's adulthood some 25 years later in the mid-1990s. At the time, Tedviashvili had joined with a group of militants who were seeking to violently overthrow the then-ruling government of Georgia headed by President Eduard Shevardnadze. Beshkenadze had a chance "roadside encounter" with Tedviashvili sometime during 1994. Alongside Tedviashvili were several men dressed in military attire and, from Beshkenadze's

perspective, seemingly armed. Frightened, Beshkenadze agreed to Tedviashvili's request to drive him and his men to an undisclosed location approximately one mile away. Little did Beshkenadze know that Tedviashvili and his men were then engaged in an unsuccessful attempt to murder an official in the Shevardnadze government.

Beshkenadze learned of this incident, as well as of Tedviashvili's subsequent successful murderous attempts, only years later upon the 1997 publication of a newspaper article that reproduced excerpts of a jailhouse interview with Tedviashvili. In that article, Tedviashvili referenced Beshkenadze by name, but explicitly absolved him of any responsibility for—or, for that matter, any knowledge of—Tedviashvili's crimes. Beshkenadze nevertheless became part of a police inquiry, during which his interrogators, he alleges, "made it clear to him that he was to cooperate with their wishes or suffer the most severe consequences." This threat allegedly included a warning from a district attorney named Siprioni that "unless Beshkenadze performed to [Siprioni's] satisfaction, he would meet the same fate as did 'the Jews during the Soviet era.'"

Beshkenadze had obtained a degree in hydrogeology, and Siprioni put him to work at a mineral-water plant in which Siprioni had an ownership interest. In his asylum application, Beshkenadze referred to his work at the plant as "slave labor" that paid him nothing. But during his testimony before the IJ, Beshkenadze conceded that he had received compensation for his time, albeit a minimal amount. He maintained his belief, however, that he "had no choice but to contribute his labor at the time." This coercion, he clarified, was directly attributable to Siprioni's anti-Semitic threat about the fate of the Jews during the Soviet era. Beshkenadze testified that he understood this threat to refer to the Soviet-era practice that "[e]very time the Jews were arrested, particularly during

the war time, . . . nobody ever saw them back." Contributing to Beshkenadze's fear was a report

from his mother in 1998 that Tedviashvili had allegedly changed his mind and decided to implicate

Beshkenadze after all in the 1994 murder plot. But Beshkenadze offered no evidence to support this

alleged change of heart.

More generally, Beshkenadze alleged that throughout his life he had encountered "anti-

Semitic-inspired professional discrimination," including "damage" to his budding soccer career,

insurmountable obstacles to his pursuit of an advanced degree, and a local school's refusal to accept

his children into the Kindergarten program. This allegation rang particularly hollow to the IJ, who

noted as follows:

> Despite the fact that the respondent feels that he was discriminated against in his
> athletic career and a career as a hydro geologist, he was able to make a living. He
> was able to save up enough money to expand the pig farm, to invest in the car wash
> in Moscow and he presumably had some money in the bank or he wouldn't have
> been able to get a non-immigrant visa to come to the United States, so the respondent
> was doing fairly well. He even owned a car which not everybody did in Georgia.
>
> . . .
>
> Plus we have his sisters. They presumably have the same mother and the same father
> and yet one sister is a doctor and the other sister is a lawyer, so they seemed to have
> survived the anti-Semitism fairly well.

Even more troubling to the IJ was the very source of this anti-Semitism: Beshkenadze's

Jewishness. Beshkenadze offered his mother's birth certificate as proof of his true religious identity.

(Under traditional Jewish law, a child's religion is determined by the religion of the mother.)

Although the IJ accepted the birth certificate as accurate, he questioned how Beshkenadze, as well

as every other member of his immediate family, could not have known of his mother's Jewishness

until he turned 16 years old. At that time, Beshkenadze's father had applied for membership in the Communist Party, and the KGB denied the father's application upon discovery of his wife's Jewish identity. The IJ also questioned whether this revelation could actually have had so profound an effect on Beshkenadze, considering that he lived a decidedly non-Jewish life. In particular, the IJ noted that Beshkenadze was baptized and raised as an orthodox Christian, and that he has remained a devout member of the Georgian Orthodox Church to the present day.

## B.     Procedural background

Kovaleva's application is entirely derivative of her husband's. Both applications lay dormant until a merits hearing in late 2004, at which time the IJ determined that Beshkenadze was not credible, denied his request for relief, and ordered him and his wife removed. A single judge of the BIA summarily affirmed the IJ's decision without opinion. The BIA judge did note, however, that the IJ's findings of fact were not clearly erroneous. Beshkenadze and his wife timely appealed the BIA's order. This court stayed their removal pending resolution of the present appeal.

## II. ANALYSIS

### A.     Asylum claim

Because the BIA summarily adopted the IJ's decision without issuing its own opinion, we review the decision of the IJ as the final administrative order. *Hasan v. Ashcroft*, 397 F.3d 417, 419 (6th Cir. 2005). Questions of law involving immigration proceedings are reviewed de novo. *Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004). We will affirm the IJ's factual findings, as well as the determination that the petitioner failed to establish eligibility for asylum, if substantial evidence

supports such determinations. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (upholding the IJ's rulings if "supported by reasonable, substantial, and probative evidence on the record considered as a whole") (citation omitted). Under this standard, we will not reverse a factual determination of the IJ unless we find "that the evidence not only supports a contrary conclusion, but *compels* it." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (emphasis in original).

### 1. Substantial evidence supports the IJ's finding that Beshkenadze was not credible

Credibility findings are findings of fact and are therefore reviewed under the substantial-evidence standard. *Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004). "Even so, the immigration judge's conclusion must be supported by specific reasons and must be based upon issues that go to the heart of the applicant's claim. In other words, if discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility." *Chen v. Gonzales*, 447 F.3d 468, 472 (6th Cir. 2006) (citations, alterations, and quotation marks omitted).

Beshkenadze characterizes the penultimate paragraph of the IJ's oral decision as "a crescendo of ambivalence." In that paragraph, the IJ stated as follows:

> To make clear what my credibility finding is, I basically find respondent is not credible, that he is probably accurate in that his mother was Jewish and is accurate that his car was stolen and used in this plot. However, otherwise I find that respondent has probably inflated and expanded his story and attempted to make it better than it really is. So I don't think that the whole story is necessarily fraudulent; parts of it are probably true. But respondent can't be depended upon for an accurate rendition of the facts. Therefore, with the caveats stated above, I find that he is not credible.

We fail to glean any ambivalence in these words. If anything, they clarify the IJ's position that the bulk of Beshkenadze's testimony was "basically" not credible, and that only the two "caveats" were

believable. Not surprisingly, the caveats were the only two facts corroborated by the documentary evidence that Beshkenadze submitted in support of his application. The IJ, moreover, explicitly noted that his acceptance of them was purely the result of this corroboration. Regarding Beshkenadze's alleged Jewish identity, which the IJ deemed to be otherwise "inherently unlikel[y]," the IJ cited "a birth certificate that says his mother has Jewish nationality." Similarly, with regard to Beshkenadze's allegation that his car was used by Tedviashvili in 1994 to carry out the latter's unsuccessful murderous plot, the IJ accepted the allegation as true only "because it is corroborated" by a newspaper article. Simply because the IJ found two corroborated allegations credible hardly renders the entirety of his credibility analysis ambivalent, as Beshkenadze contends.

Beshkenadze also fails to mention the opening paragraph of the IJ's credibility analysis, which provides additional context for the excerpt quoted above. There, the IJ explicitly acknowledged that "in most cases the truth is somewhere in between" completely credible and completely incredible, but then noted that "[t]here certainly are reasons to find [Beshkenadze] completely incredible." In other words, although credibility determinations typically present close questions, Beshkenadze's credibility, in the IJ's opinion, did not.

Whether the IJ's credibility determination was justified by "specific reasons," of course, is a separate question from whether the credibility determination was ambivalent. But the inconsistencies cited by the IJ do in fact "go to the heart of [Beshkenadze's] claim." *Chen*, 447 F.3d at 472. Foremost among these was Beshkenadze's failure to mention either the 1994 car incident with Tedviashvili or the subsequent "slave labor" at Siprioni's mineral-water plant in his initial asylum application. Both of these episodes *were* the heart of Beshkenadze's claim. The IJ also cited

the inconsistency between Beshkenadze's allegation of "anti-Semitic-inspired professional discrimination" and his undisputed ownership of various forms of property as well as a graduate degree in hydrogeology. Finally, the IJ noted the tension between Beshkenadze's claim to anti-Semitic victimization and his thoroughly Christian orthodox lifestyle. Beshkenadze's Jewishness, as noted above, was the thread that tied his alleged "cycles" of persecution together.

In light of these inconsistencies relied upon by the IJ, we hold that the adverse credibility determination does not constitute reversible error. The evidence in the record simply does not compel the conclusion that Beshkenadze was in fact credible. *See Marku*, 380 F.3d at 986.

> **2.** ***Even if the IJ erred in his credibility determination, substantial evidence supports the IJ's alternative conclusion that Beshkenadze was not entitled to asylum***

Adjudicating a request for asylum involves a two-step inquiry: "(1) whether the applicant qualifies as a refugee as defined in [8 U.S.C.] § 1101(a)(42)(A), and (2) whether the applicant merits a favorable exercise of discretion by the Attorney General." *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998) (citation and quotation marks omitted). With respect to the first issue, the term "refugee" is defined by federal law as

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A).

"The asylum applicant bears the burden of establishing that he or she qualifies as a refugee 'either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution.'" *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003) (quoting 8 C.F.R. § 208.13(b)). Once the applicant shows that he or she has suffered from past persecution, the applicant is presumed to have a well-founded fear of future persecution. *Mikhailevitch*, 146 F.3d at 389 (quoting 8 C.F.R. § 208.13(b)(1)(i)). This presumption can be rebutted "only through establishing by a preponderance of the evidence that since the persecution occurred, conditions in the applicant's country 'have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he were to return.'" *Id.* (citation omitted).

In the present case, after concluding that Beshkenadze was not credible, the IJ alternatively determined that, even if Beshkenadze were found to be credible, he was still ineligible for asylum because he had failed to prove that his fear of future persecution was "on account of any of the factors of the Act." (The IJ had previously determined that Beshkenadze had not been "subjected to past persecution as that term is defined in asylum law.") Specifically, the IJ determined that "[t]he situation with the district attorney [Siprioni] is only remotely connected to respondent being part Jewish." This determination echoed the IJ's earlier conclusion that Beshkenadze's fear of persecution by Siprioni, as an initial matter, was not objectively well-founded:

> Respondent may or may not have a subjective belief that Siprioni wishes to do him in now that he's not needed to run the water plant. However, looked at objectively, there does not appear to be the slightest reason why Siprioni would be interested in respondent, or why any law enforcement officer would be interested in respondent, and that fact is clearly brought out by the fact that Interpol requested information from the Georgian officials as to whether respondent was wanted for any kind of a crime and apparently he is not. Certainly, if he were wanted for conspiracy to kill the

President, even a former President at this point, that answer would not have been given and Georgia would probably be requesting his extradition now which they are not.

Beshkenadze misses the point when he argues that this determination by the IJ constituted an erroneous "backtrack" and "*qualification* of the credibility of Petitioner's well-founded subjective fear of persecution." (Emphasis in original.) As this court recently reiterated, "[w]hether an applicant establishes a well-founded fear of future persecution is measured by a subjective *and* an objective standard." *Berri v. Gonzales*, 468 F.3d 390, 396 (6th Cir. 2006) (emphasis added). The IJ clearly determined that Beshkenadze had failed to satisfy the objective component of this standard. If this was a "qualification," in other words, it was a qualification required by law. Beshkenadze's insistence that his claim "is based on his subjective belief" of persecution by Siprioni is precisely the problem. We do not find the IJ's analysis to be erroneous, much less lacking evidentiary support.

**B.     Withholding of removal and relief under the CAT**

Beshkenadze's application for asylum also contained a request for the withholding of removal and protection under the CAT. An applicant seeking the withholding of removal "must show a 'clear probability of persecution,' which is a stricter standard than the 'well-founded fear' standard that applies with respect to applications for asylum." *Ali*, 366 F.3d at 411 (citing *INS v. Stevic*, 467 U.S. 407, 430 (1984)). Because substantial evidence supports the IJ's conclusion that Beshkenadze is not eligible for asylum, he "cannot satisfy the more stringent standard for withholding of deportation." *See Daneshvar v. Ashcroft*, 355 F.3d 615, 625 (6th Cir. 2004).

To obtain relief under the CAT, Beshkenadze must show that he would more likely than not be subjected to torture after being deported to Russia. *See* 8 C.F.R. § 1208.16(c)(2) (placing on the

applicant seeking relief under the CAT the burden of proving "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal"); *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004) (reciting the same standard). The "more likely than not" burden of proof is similarly higher than the "well-founded fear" burden required to establish a claim for asylum, so that substantial evidence also supports the rejection by the IJ of Beshkenadze's CAT claim. *See Elezaj v. Gonzales*, 163 F. App'x 358, 361 (6th Cir. 2005) (holding that if an applicant fails to meet the standard for asylum, he "*a fortiori*" fails to meet the requirements for withholding of removal and relief under the CAT).

## C. Due process claim

Beshkenadze's final argument challenges the BIA's summary affirmance of the IJ's decision. Specifically, he argues that the "novel factual situation" presented by his case warranted review "by a three-member panel of the Board pursuant to 8 C.F.R. § 1003.1(e)(6)." He also contends that the BIA must provide an independent ground for affirmance "in a case in which the reasoning proffered by the IJ is faulty."

The core of Beshkenadze's argument—namely, that the single-judge, summary-affirmance procedure itself violates his due process rights under the Fifth Amendment—is squarely foreclosed by this circuit's precedent in *Denko v. INS*, 351 F.3d 717, 730 (6th Cir. 2003), where the court rejected an identical argument. The *Denko* decision was explained in this court's more recent opinion in *Ramaj v. Gonzales*, 466 F.3d 520, 526-27 (6th Cir. 2006):

> Because Denko had failed to provide tangible evidence that the BIA neglected to conduct a proper review prior to issuing its summary opinion, this court refused to assume "a complete break-down in the system." [*Denko*, 351 F.3d] at 728-29. It

further determined that no due process violation resulted from the BIA's affirmance of the IJ without issuing an opinion. *Id.* at 730. According to *Denko*, "the summary-affirmance-without-opinion rule renders the IJ's decision the final agency order, and we review that decision. Thus, Denko receives the 'full and fair' review that she is entitled to receive." *Id.*

Beshkenadze insists, however, that *Denko* must be read in light of this court's opinion in *Gjyzi v. Ashcroft*, 386 F.3d 710 (6th Cir. 2004), where the petitioner successfully challenged the BIA's summary-affirmance procedure. But as the government correctly observes, the procedural posture at issue in *Gjyzi* was categorically different from that at issue in the present case. There, the BIA's summary opinion was inconsistent in that it affirmed the IJ's decision despite explicitly rejecting the IJ's dispositive credibility finding. *Id.* at 715-16. Here, by contrast, the BIA explicitly *adopted* the IJ's factual findings and conclusions of law, concluding that the former were not clearly erroneous. Beshkenadze's reliance on *Gjyzi*, therefore, is misplaced.

To be sure, Beshkenadze is correct in noting that "the application of precedent to a novel factual situation" is one of the statutorily recognized exceptions to the summary-affirmance-without-opinion procedure. *See* 8 C.F.R. § 1003.1(e)(4)(i)(A). So, too, is "the need to review a clearly erroneous factual determination by an immigration judge." *Id.* § 1003.1(e)(6)(v). But the latter exception does not apply where, as here, the BIA explicitly determines that the IJ's findings of fact were not clearly erroneous. And in *not* assigning Beshkenadze's case to a three-judge panel, the BIA necessarily, albeit implicitly, determined that his case did not present a "novel factual situation." *See id.* § 1003.1(e)(4)(i) (noting that a single BIA judge "shall affirm" the IJ's decision without opinion "if the Board member determines," among other things, that "[t]he issues on appeal . . . do not involve the application of precedent to a novel factual situation").

The BIA, which reviews exponentially more immigration cases than this court, is far better positioned than we are to determine what constitutes a "novel" set of facts. *See Denko*, 351 F.3d at 730 n.10 ("[A]dministrative agencies and administrators will be familiar with the industries which they regulate and will be in a better position than federal courts or Congress itself to design procedural rules adapted to the peculiarities of the industry and the tasks of the agency involved." (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 525 (1978))). Beshkenadze's due process argument is accordingly without merit.

### III. CONCLUSION

For all of the reasons set forth above, we **DENY** the petition for review filed by Beshkenadze and his wife.