**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0703n.06

**12-3612**

| | | |
|---|---|---|
| **UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT** | | **FILED** Jul 31, 2013 DEBORAH S. HUNT, Clerk |

MODOU LAMIN HYDRA,       )
                                   )
        Petitioner,             )
                                   )   ON PETITION FOR REVIEW FROM A
v.                                    )   FINAL ORDER OF THE BOARD OF
                                   )   IMMIGRATION APPEALS
ERIC H. HOLDER, JR., Attorney General,   )
                                   )
        Respondent.          )

Before: DAUGHTREY, McKEAGUE, and GRIFFIN, Circuit Judges.

**PER CURIAM.** Petitioner Modou Lamin Hydra, a citizen of Sierra Leone, appeals the Board of Immigration Appeal's denial of his asylum application. The BIA found significant omissions and inconsistencies between Hydra's testimony and his asylum application and, thus, found him to be not credible. The BIA further held that even if Hydra had been credible, he failed to present evidence sufficient to show past persecution or a well-founded fear of future persecution. For the reasons set out below, we deny the petition for review of the BIA's decision.

**FACTUAL AND PROCEDURAL BACKGROUND**

Modou Hydra is a 36-year-old male citizen of Sierra Leone. He arrived in the United States with false papers on April 10, 2003, after living in Gambia for a short time. Within

the one-year statute of limitations, Hydra applied for asylum. In his original asylum application, Hydra claimed that his uncle had been beaten and jailed for providing food to the Revolutionary United Front (RUF), a rebel group at war with the Sierra Leonean government from 1991 to 2002. Hydra also claimed that the government considered him to be associated with the rebels because of his uncle's actions, so he feared "severe torture and maltreatment" if he returned to Sierra Leone. On the form, he indicated that his asylum claim was "based on . . . [the] Torture Convention." Hydra handwrote his application and signed it. He did not indicate on the application whether anyone helped him prepare it, although he would later claim that a nonprofit organization assisted him.

An asylum officer interviewed Hydra in June 2004. He held that Hydra failed to "show[ ] there is a reasonable possibility of suffering the persecution he fears" because Hydra did not allege governmental harm rising to the level of past persecution and because country conditions had changed sufficiently after the end of the civil war to negate future persecution concerns. Hydra subsequently conceded removability as charged and was placed in removal proceedings.

Before Hydra's removability hearing in 2006, he revised his asylum application. Prepared with the help of counsel, this version clarified that his uncle's support for the rebels was forced, out of fear that he would be "robbed or killed by them if he did not join." Hydra related that he had seen his father and another uncle shot in government-RUF crossfire and claimed that he suffered "bruises and scars" during the course of the fighting.

Most importantly, in this application Hydra claimed for the first time that he was captured by the rebels in 1998: "I was taken by rebel forces, along with many other young men . . . . We were told that we were going to be trained as rebel fighters for an attack on Freetown and that anyone that did not participate in the attack would be shot and killed. I escaped this camp after two months of being held there and fled to Freetown." Hydra also clarified that he feared the government suspected that he was "a supporter of the R.U.F. rebel forces" not because of his uncle's involvement, but "because [his] name was put in the R.U.F. record book when [Hydra] was seized by them in 1998." Hydra also revised his asylum claim to be predicated on political opinion and membership in a particular social group, as well as sustaining his original Torture Convention claim.

On September 26, 2006, Hydra had a hearing before an immigration judge, who denied Hydra relief on all grounds, including asylum, withholding of removal pursuant to the INA, withholding of removal pursuant to the Convention Against Torture, and voluntary departure (because Hydra entered the United States with false papers). Hydra was the only witness at his hearing, although he provided letters from family and friends in Gambia to support his testimony. The immigration judge recounted Hydra's testimony, which included further details about his uncle's forced involvement in the RUF and his father's death. Hydra also offered details of his two-month capture by the RUF, including the forced-labor conditions. He said that after he escaped from the camp, security forces purportedly came looking for him at his uncle's home, but when he was not there, they left. Hydra then left for Gambia, where he stayed for most of 2001 through 2003, before coming

to the United States.  In February 2003, Hydra married a Gambian woman (his second wife), who had political problems of her own because of her family's association with the United Democratic Party, an opposition group.  Gambian officials jailed Hydra after they came looking for his wife and Hydra was unable to tell the officials where she was.  Hydra consequently claims to believe "he would be killed if he was returned to Sierra Leone" and that he also feared returning to Gambia, where "he was tortured and beaten."

The immigration judge noted that Hydra "failed to mention many of these details in his initial asylum application."  Finding that Hydra's oral testimony "was not fully consistent with his written application" and that he failed to "answer all questions sincerely, forthrightly and truthfully," the immigration judge held that he was not a credible witness.  Hydra's explanation for his omissions – namely that his first asylum application was prepared without the help of counsel – did not adequately explain the discrepancies.  Hydra was "inconsistent and unclear" on details about which the immigration judge would "expect him to have an accurate memory," such as when he was held by the rebels.  The immigration judge also noted inconsistencies between Hydra's testimony and the letters filed in his support, including discrepancies about why Hydra left Gambia and when he married his wife.

The immigration judge further held that Hydra failed to meet "his burden of proof to establish that he had suffered past persecution in Sierra Leone on account of his political opinion or a political opinion imputed to him or any other protect[ed] ground."  Similarly,

Hydra failed to meet his burden to show a well-founded fear of future persecution because "a preponderance of evidence" shows "fundamentally changed country conditions in Sierra Leone" after the end of the civil war in 2002.

Hydra appealed. The BIA returned the case to the immigration court because "the tape containing the testimony of the hearing . . . [was] defective." The BIA ordered the immigration court to "take such steps as are necessary and appropriate to enable preparation of a complete transcript of the proceedings including a new hearing, if necessary."

After conducting a new proceeding, a different immigration judge, Rodger Harris, "adopt[ed] the previous Immigration Judge's ruling and [certified] the record back to the Board for further review." Furthermore, "[b]ecause Respondent's testimony on remand was substantially, if not completely, identical to his previous testimony," Judge Harris "adopt[ed] the previous Immigration Judge's adverse credibility determination." As before, the immigration judge found Hydra's oral testimony to be inconsistent with his first asylum application. On remand, Hydra gave additional testimony that a nonprofit organization helped him prepare his first asylum application, which the immigration judge believed undercut his argument that the significant omissions in it were a result of his inability to properly "express himself."

Further complicating Hydra's claim, the original application included "details regarding his uncle's forced support of the RUF" and generalized descriptions of "forced

recruitment of young boys by the RUF" without mentioning "his own forced recruitment and detention." Like the previous immigration judge, Judge Harris also considered the conflicts between Hydra's statements and the letters filed in his support, and the discrepancies between his statements and what he told the asylum office. Additional discrepancies had emerged during cross-examination about whether Hydra began to spend most of his time in Gambia in 1998 or 2000. Judge Harris further found that Hydra failed to prove past persecution and could not establish a reasonable fear of future persecution. Finally, the immigration judge noted in passing that Hydra could properly be considered to have "firmly resettled" in Gambia, making him ineligible for asylum under 8 U.S.C. § 1158(b)(2)(A)(vi). Thus, Judge Harris denied all of Hydra's asylum and withholding claims.

The BIA affirmed the immigration judge's holdings with respect to Hydra's credibility and asylum claims.[1] It agreed with the immigration judge that Hydra's omissions in his original asylum application were "present in the record" and "go to the heart of" Hydra's claim. Because Hydra did not "adequately explain" the omissions on appeal, the BIA held that the immigration judge did not commit clear error in finding Hydra not credible.

Similarly, the BIA agreed that Hydra had failed to show past persecution or a reasonable fear of future persecution. It found that, even if Hydra had been credible, Hydra could not show "more than a few isolated incidents of verbal harassment or

---

[1]In his appeal to the BIA, Hydra waived the denial of his withholding of removal and requests for protection under the Convention Against Torture.

intimidation" by the government, which were insufficient to establish past persecution. Hydra's two-month detention by the RUF may have constituted persecution, but the BIA found that Hydra failed to "establish a nexus between the alleged harm suffered or feared by the RUF rebels and one of the protected grounds enumerated under the Act." Finally, the BIA held that even if Hydra had established past persecution, the "Department of Homeland Security ha[d] met its burden to rebut the presumption of future persecution." Based on these holdings, the BIA declined to consider any other issue presented for appeal, including the immigration judge's firm resettlement finding. This appeal followed.

**DISCUSSION**

Because the BIA reviewed the immigration judge's legal conclusions *de novo*, we treat the BIA decision as the final agency action. *Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007). This circuit reviews factual findings by the BIA under a substantial evidence standard, meaning that "we must sustain an administrative decision if that determination is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Sarr v. Gonzales*, 485 F.3d 354, 359 (6th Cir. 2007) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). We will not "overturn a Board's factual determination" unless "'the evidence not only supports [a contrary] conclusion, but compels it.'" *Id.* at 360 (alteration in original) (quoting *Elias-Zacarias*, 502 U.S. at 481 n.1). By contrast, "[q]uestions of law and constitutional questions are subject to de novo review." *Lin v. Holder*, 565 F.3d 971, 976 (6th Cir. 2009).

To gain asylum, an applicant must first qualify as a refugee. He must show that he cannot return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *see* 8 U.S.C. § 1158(a) & (b); *Bah v. Gonzales*, 462 F.3d 637, 639 (6th Cir. 2006). "'[R]esolution of any request for asylum involves a two-step inquiry: first, whether the petitioner is a 'refugee' within the meaning of the [Immigration and Nationality Act], and second, whether the petitioner merits a favorable exercise of discretion by the Attorney General.'" *Kaba v. Mukasey*, 546 F.3d 741, 747 (6th Cir. 2008) (alteration in original) (quoting *Chen v. Gonzales*, 447 F.3d 468, 472 (6th Cir. 2006)). "'An applicant who has been found to have established . . . past persecution shall also be presumed to have a well-founded fear of persecution on the basis of the original claim,' unless the immigration judge finds, by a preponderance of the evidence, either . . . 'a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality . . . or . . . [that t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality." *Id.* at 748 (quoting 8 C.F.R. § 208.13(b)(1) & 8 C.F.R. § 208.13(b)(1)(i)).

The BIA and immigration judges found that Hydra was not a "refugee" because he could not show past persecution and could not establish a well-founded fear of future persecution. These findings were largely driven by their conclusion that Hydra was not a credible witness. As with other findings of fact, "[c]redibility determinations . . . are

reviewed under the substantial evidence standard." *Sylla v. I.N.S.*, 388 F.3d 924, 925 (6th Cir. 2004). Because Hydra's asylum application was filed before May 11, 2005, the standards for determining credibility promulgated by the REAL ID Act of 2005, 8 U.S.C. § 1158(b)(1)(B)(iii), do not apply to his claim. *See Kaba*, 546 F.3d at 749 n.1. Using the prior standard for credibility determinations, "the immigration judge's conclusion must be supported by specific reasons and must be based upon issues 'that go to the heart of the applicant's claim.'" *Id.* at 749 (quoting *Sylla*, 388 F.3d at 926).

The immigration judge based his adverse credibility finding on omissions in Hydra's initial asylum application and inconsistencies between the application and Hydra's testimony and supporting affidavits. "Like affirmative inconsistencies, omissions may form the basis of an adverse credibility determination, provided that they are substantially related to the asylum claim." *Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005). However, "this court exercises extra care in evaluating omissions from asylum applications." *Shkabari v. Gonzales*, 427 F.3d 324, 329 (6th Cir. 2005). As long as an asylum application provides "generalized claims" upon which an applicant "elaborate[s]" in his hearing, omissions of specific facts in an application will not be grounds for an adverse credibility finding. *Liti*, 411 F.3d at 639; *cf. Secaida-Rosales v. I.N.S.*, 331 F.3d 297, 308 (2d Cir. 2003) ("An applicant's failure to list in his or her initial application facts that emerge later in testimony will not automatically provide a sufficient basis for an adverse credibility finding.").

Here, the BIA identified a number of inconsistencies and omissions in Hydra's testimony that collectively support an adverse credibility holding. Although some of the alleged inconsistencies seem explainable, taken as a whole, they do not compel a contrary result. *See Vasha v. Gonzales*, 410 F.3d 863, 870 (6th Cir. 2005) (cumulative small inconsistencies may form basis of credibility holding even if some inconsistencies are "unsupported by the record").

First, Hydra's original asylum application did not include his purported forced recruitment by the RUF rebels in 1998. In his revised application, filed three years later, Hydra mentioned this period of detention, and he testified about it during both of his hearings. This claim is fundamental to Hydra's claim of past persecution. Even if one were to liberally construe Hydra's first application, the closest he comes to discussing this detention is saying that he was "accused of being a rebel." Yet elsewhere on his first application, he explains that he was falsely accused of RUF membership because the government conflated his uncle's actions with his own. Nothing in the first application compels the conclusion that the BIA erred in considering this omission and finding that it went to the heart of Hydra's claim.

Secondly, and relatedly, because Hydra omitted any discussion of his time in the rebel camp, he necessarily omitted any description of his treatment by the RUF. In his oral testimony, for example, Hydra detailed a brutal beating by the RUF that left him with a dislocated shoulder. This treatment was not mentioned in either his original or revised

asylum application. Although it could be argued that this was merely a detail that elaborated on the broad claims presented in his revised application, neither application provided information about the RUF physically abusing Hydra directly. Being taken by rebel forces arguably differs fundamentally from being physically abused. Thus BIA did not clearly err in considering this omission substantially related to Hydra's claim.

Third, the BIA noted that Hydra's first application failed to "mention[ ] government authorities in Sierra Leone targeted [Hydra] because of his imputed political involvement and affiliation with the RUF rebels." This finding is a closer call. In Hydra's first application, he repeatedly mentioned that he had been accused of being a rebel. Although the application is far from clear, it unquestionably states three different times that Hydra was "accused of being a rebel." That said, Hydra's first application seemingly indicated that the government targeted him because he was associated with his uncle. The original application does not mention that Hydra's name was on a RUF list seized by the government. An argument could be made that Hydra's inclusion of only one reason the government targeted him and not another should not be considered a material omission as much as an over-generalization. However, nothing in the record compels us to overturn the BIA's findings, and we conclude that under the deferential standard of review we must apply, the BIA's credibility holding must be upheld.

Hydra blamed his limited English skills, his lack of counsel's help in preparing his first application, and the inadequate aid provided by a non-profit organization for these

omissions. The BIA found none of these explanations availing. Instead, the BIA cited Hydra's admission that he handwrote his first application – showing he possessed at least minimal English skills – and his failure to indicate on his application that he was aided in its preparation to counter Hydra's claim that his first application should be discounted. Without any evidence in the record to support the contrary, it was not clearly erroneous for the BIA to hold that Hydra failed to provide an adequate explanation for his omissions.

In addition to discounting Hydra's testimony as not credible, the BIA found that Hydra's supporting affidavits "did not independently satisfy his burden." Hydra presented five letters from family and friends in Gambia to support his claim, but none of them provided information about his past treatment by the RUF or the Sierra Leonean government. Although the letters supported his claim of fear that the Sierra Leonean government had his name on a list, that fact alone is insufficient to undergird Hydra's entire asylum claim.

Because we agree with the BIA's ruling on Hydra's credibility in connection with his asylum claim, we find it unnecessary to discuss at length the alternative bases for its decision to affirm the immigration court's denial of relief.

**CONCLUSION**

For the reasons set out above, we DENY the petition for review.