RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0389p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

DED RAMAJ and VERA RAMAJ,

　　　　　　　　　　　　*Petitioners*,

　　　*v.*

ALBERTO GONZALES, Attorney General of the
United States,

　　　　　　　　　　　　*Respondent*.

No. 05-3531

On Appeal from the Board
of Immigration Appeals.
Nos. A73 551 497; A73 663 692.

Submitted: September 19, 2006

Decided and Filed: October 24, 2006

Before: CLAY and GILMAN, Circuit Judges; OBERDORFER, District Judge.[*]

_____

## COUNSEL

**ON BRIEF:** Richard A. Kulics, Henderson, Nevada, for Petitioners. Craig A. Weier, UNITED STATES ATTORNEY, Detroit, Michigan, for Respondent.

_____

## OPINION

_____

　　　RONALD LEE GILMAN, Circuit Judge. Ded Ramaj and his wife Vera Ramaj are natives of Albania who entered the United States illegally in 1997. They prepared an application for asylum and withholding of removal in July of 1997, but the application was inexplicably not processed by the government for several years. In 2001, an Immigration Judge (IJ) denied the petitioners' request for relief and ordered them removed. The Board of Immigration Appeals (BIA) affirmed in a per curiam opinion, adopting the IJ's decision. Ramaj and his wife timely petitioned for review. For the reasons set forth below, we **DENY** their petition.

---

　　　[*]The Honorable Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by designation.

# I. BACKGROUND

## A.        Factual background

Ded Ramaj (Ramaj) is the lead petitioner in this case, claiming asylum based on his alleged persecution in Albania. Vera Ramaj's claim for asylum is based solely on her husband's application. This case turns on issues of credibility and the alleged inconsistencies between Ramaj's two asylum applications and his testimony.

### *1.        Asylum applications*

The Ramajs prepared their first application for asylum and withholding of removal in July of 1997, but the application was not processed by the government until the fall of 2001. In the application, Ramaj sought asylum based on alleged persecution due to his Roman Catholic faith and political activities. The application states that he was a member of the Balli Kombetar political party since April of 1990, and that he tried to prevent other Albanians from investing in fraudulent pyramid schemes perpetrated by the government. He claimed to have been taken to the police station in Mamurras on an unspecified date and severely beaten. In response to a separate question in the first asylum application, Ramaj alleged that he was arrested in February of 1997 and was held for 10 days. He also claims that his family was detained and beaten on several occasions. No detail is provided as to any of these incidents. The application is not clear as to whether Ramaj was talking about one or two incidents of mistreatment that he endured personally. At the close of the application, the section that is to be completed by persons assisting in the preparation of the asylum application is blank.

In October of 2001, the Ramajs filed a second application for asylum, this time with the assistance of an attorney. Ramaj again claimed persecution on account of his political opinions and "partly" because of his religious beliefs. He stated that he was elected as a representative of the Democratic Party for the city of Raj in 1991, a post that he allegedly occupied until October of 1992. After Ramaj resigned due to disillusionment with the party, he said that he "was marginalized" and "was unable to find work." In 1994, Ramaj left to stay in his uncle's home in Mamurras. There he met Vera and joined the Balli Kombetar political party. According to the second application, and inconsistent with the first, he joined Balli Kombetar in 1994 and was a member until February of 1997.

The second application states that Ramaj was twice arrested and beaten by the Albanian police. The first incident allegedly occurred in December of 1996, when he contends that he was held at the police station in Mamurras overnight and beaten three times. Ramaj claims that these abuses took place because he was participating in demonstrations against pyramid schemes perpetrated by the government. In February of 1997, after allegedly participating in one of these demonstrations, he was again arrested, beaten, and held for a period of 10 days. Ramaj was finally released "because the government opened the jails and we all left." According to the second application, Ramaj believes that he will be arrested if he returns to Albania because he is "considered an outsider, a troublemaker, and a rabble rouser, because [he] spoke out, and set down in writing [his] thoughts about those people who are recreating a totalitarian society while calling it a 'democracy.'" Ramaj also expressed his belief that he would be subjected to torture because "Albanian police routinely abuse and torture detainees."

### *2.        Removal hearing and exhibits*

In July of 2004, a removal hearing was held in Detroit, with the IJ sitting by designation and appearing by video conference from New York. Although Ramaj, his wife, and a family friend all were present at the hearing, Ramaj was the only witness who testified. He and his wife both

conceded removability and requested asylum, withholding of removal, and relief under the Convention Against Torture (CAT).

The IJ then discussed the various exhibits that were before the court. Most were admitted without issue, but the IJ challenged the Ramajs' method of authenticating Exhibit 8. Exhibit 8 consists of nine pages, the first of which is a cover page, followed by two documents. The first document starts on the next page and is in a foreign language, with the English translation following. It says that Ramaj was "stopped by Police forces of Mamurras for 2 days in December of 1996 due to his support for [the] National party. With the same motive he was arrested for 10 days in February of 1997." On the face of the English translation is a faded stamp and a signature, which Ramaj alleges is the attestation of the translator. The next page, in two languages (a foreign language and English), is a "signature certificate" saying that the translator Apostol Spiro signed the English translation in the presence of Fatri Hoxha, a "public notary." Finally, a United States Embassy certification appears on the next page, certifying that Fatri Hoxha was the representative of the Ministry of Foreign Affairs of the Republic of Albania and that he was the person who signed the signature certificate.

The second document, also in a foreign language, follows. The English translation is on the next page, stating: "The citizen DED NDU RAMAJ resident of Mamurras city is mistreated from the police. As a result of that we found damage of the articulations, edemas in the body and hematomas. He has been under our medical care on antibiotics therapy, vitamins therapy for a period of two weeks in the month of February 1997. This verification is released as documentation." A doctor signed the statement. On the face of the English translation is a faded stamp and a signature, which Ramaj alleges is the attestation of the translator. The next page is the "signature certificate" saying that the translator Apostol Spiro signed the English translation in the presence of Fatri Hoxha, a "public notary." Then comes the United States Embassy certification, certifying that Fatri Hoxha was the representative of the Ministry of Foreign Affairs of the Republic of Albania and that he was the person who signed the signature certificate.

The government objected to the admission of the documents contained in Exhibit 8 "because the signatures and positions of the officers who signed the [translation] attestations were not certified as required by 8 C.F.R. [§] 1287.6 or translated as required by the regulations." This argument was found persuasive by the IJ, who excluded the documents for lack of proper authentication. Ramaj challenges the exclusion of these documents on appeal.

After the IJ resolved the dispute regarding Exhibit 8, Ramaj testified. He said that he first became involved in politics at the beginning of the democratic movement in 1990. Ramaj's membership in the Democratic Party allegedly began in 1991, after which he was elected as a representative of the party at the local polling station. At some point after the Democratic Party won the election in 1992, Ramaj said that he became disillusioned and terminated his membership.

Ramaj testified that he moved from his hometown of Kurbin to his cousin's house ("moved to my uncle's son") in Mamurras. When asked why he left his hometown, Ramaj said that he "left because [he] didn't feel safe in Kurbin and the killing started." He claimed that these killings were perpetrated by "masked people from the police." Ramaj believed that he could be a target "[b]ecause [he] . . . resigned from the Democratic Party" due to his objections. He had known some people who were killed, and he "wouldn't stay with [his] mouth shut." But speaking out against the injustices would allegedly put him at risk.

Contrary to both his first and second written applications, Ramaj testified that he was accepted as a member of the Balli Kombetar party in Mamurras in September of 1996. He then began protesting against pyramid schemes. In December of 1996, he said that masked police came to the home where he was staying, ransacked it, and arrested Ramaj and his cousin. They were

allegedly imprisoned for 24 hours at the Mamurras police department, during which time they were beaten, but not severely enough to cause Ramaj any injuries on his body. The assailants warned Ramaj and his cousin not to protest anymore.

In February of 1997, Ramaj was again engaged in public protest in Mamurras. Although in his second asylum application Ramaj indicated that he was protesting against the pyramid schemes, he testified that he was also objecting to the change in the political situation in Albania. He was allegedly arrested and jailed for ten days. Ramaj also claimed that he was severely beaten, resulting in wounds all over his body that caused him to be treated by a doctor for several days. He said that he was finally released from confinement on February 15, 1997 after the Democratic Party fell from power. Ramaj testified that the people simply opened the door of the prisons and he walked out. By the end of February, Ramaj had left Albania. He said that he arrived in the United States on March 1, 1997. Contradicting himself, Ramaj then said that all of this happened before the Democratic Party was out of power.

### 3.      *IJ's decision*

At the conclusion of the hearing, the IJ issued an oral decision. The IJ reiterated that he was not accepting the Exhibit 8 documents containing evidence of Ramaj's detention and medical treatment. According to the IJ, the documents were not properly translated and were deficient because they failed to verify that the signatures were actually those of the persons who allegedly signed the documents.

The IJ also noted several inconsistencies between the asylum applications and Ramaj's testimony, the most important of which are summarized below. In his first application, Ramaj failed to state that he was a member of the Democratic Party (let alone that he was an elected official), instead listing only his membership in the Balli Kombetar party. Ramaj then provided widely different dates in his testimony and in his documents for when he allegedly became involved in the Balli Kombetar political party. He testified that he became a member in September of 1996, but a membership document he submitted showed him joining as of January of that year. This contrasts with the two asylum applications he submitted, which state two other dates, one in 1990 and one in 1994.

The reason that Ramaj provided for leaving his hometown also changed between his applications and his testimony. He originally said that he left because he was marginalized and was unable to find work, but in his testimony he said that he left because of "the killings." Finally, Ramaj's explanation for why he was protesting in February of 1997 changed from contesting the government's participation in pyramid schemes to protesting a change in the political climate in the country.

These inconsistencies led the IJ to conclude that Ramaj was not a credible witness. But even if Ramaj were credible, opined the IJ, he still would not be entitled to asylum because the conditions in Albania have improved greatly since the alleged instances of Ramaj's mistreatment. The IJ's conclusion regarding the changed country conditions was based upon country reports issued by the U.S. Department of State.

In the end, the IJ found that the Ramajs did not qualify for asylum. Because the Ramajs did not meet the standard for asylum, the IJ concluded that they also failed to meet the more stringent standard for withholding of removal. The IJ went on to state that Ramaj failed to show that any instances of mistreatment, even if his story were credible, met the definition of torture under the CAT.

After the petitioners appealed the IJ's decision, the BIA issued a per curiam order adopting the decision of the IJ without further elaboration.  The petitioners then filed this timely petition for judicial review.

## II.  ANALYSIS

### A.        The BIA's summary affirmance did not violate the Ramajs' due process rights

The Ramajs argue first that the BIA failed to subject the IJ's decision to meaningful review when it summarily affirmed in a per curiam decision.  In response, the government contends that their claim is foreclosed by this court's decision in *Denko v. I.N.S.*, 351 F.3d 717, 725-30 (6th Cir. 2003).  In *Denko*, a challenge was made to the BIA's streamlining procedures, which provide for summary affirmance of the IJ's decision without opinion where a single BIA member determines, among other things, that the decision was correct, free of prejudicial error, and squarely controlled by existing precedent. *Id*. at 725 & n.4.  This court rejected Denko's argument, "concluding that the BIA's streamlining procedures do not themselves alone violate an alien's rights to due process." *Id.* at 730.  Because Denko had failed to provide tangible evidence that the BIA neglected to conduct a proper review prior to issuing its summary opinion, this court refused to assume "a complete break-down in the system." *Id.* at 728-29.  It further determined that no due process violation resulted from the BIA's affirmance of the IJ without issuing an opinion. *Id.* at 730.  According to *Denko*, "the summary-affirmance-without-opinion rule renders the IJ's decision the final agency order, and we review that decision. Thus, Denko receives the 'full and fair' review that she is entitled to receive." *Id.*

In an effort to avoid the *Denko* decision, the Ramajs try to cast their argument as being something other than contending that the summary-affirmance procedure in and of itself deprived them of due process.  They claim that the IJ's decision was full of errors and that the BIA's per curiam decision does not "evidence that it underwent thoughtful, independent review."  "[W]here the alien provided specific detailed, recognized reasons for the appeal," the Ramajs argue, "the minimum the BIA should have done was address the issues present[ed] and explain the rationale behind its decision."  The substance of their argument, however, is precisely the same as that foreclosed in *Denko*.   Because *Denko* does not require the BIA to issue a reasoned opinion, and because the Ramajs have failed to present any evidence that the BIA failed to conduct a proper review, we find no error. *See Denko*, 351 F.3d at 728-30.

### B.      Ramaj's asylum claim

Because the BIA summarily adopted the IJ's decision without issuing its own opinion, we review the decision of the IJ as the final administrative order. *Hasan v. Ashcroft*, 397 F.3d 417, 419 (6th Cir. 2005).  Questions of law involving immigration proceedings are reviewed de novo. *Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004).  We will affirm the IJ's factual findings, as well as the determination that the petitioner failed to establish eligibility for asylum, if substantial evidence supports such determinations. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (upholding the IJ's rulings if "supported by reasonable, substantial, and probative evidence on the record considered as a whole") (citation omitted).  Under this standard, we will not reverse a factual determination of the IJ unless we find "that the evidence not only supports a contrary conclusion, but *compels* it." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (emphasis in original).

#### 1.      *Substantial evidence supports the IJ's finding that Ramaj was not credible*

Adverse credibility findings are findings of fact and are therefore reviewed under the substantial-evidence standard. *Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004).  "Even so, the immigration judge's conclusion must be supported by specific reasons and must be based upon issues that go to the heart of the applicant's claim.  In other words, if discrepancies cannot be viewed

as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility." *Chen v. Gonzales*, 447 F.3d 468, 472 (6th Cir. 2006) (alterations, citations, and quotation marks omitted).

Here, the inconsistencies relied upon by the IJ do go to the heart of Ramaj's application and can be viewed as attempts to enhance his claims of persecution. In his second application, for example, Ramaj sought asylum based primarily on his political activities, including activities in the Democratic Party. But his first application failed to mention that he was even involved with the Democratic Party, let alone that he was an elected official for a year and a half. The IJ reasonably relied on this inconsistency in finding that Ramaj was not credible. In a case like this where the asylum claim is based on political persecution, an inconsistency about the level of involvement in political activities (especially Ramaj's omission in the first application that he was allegedly an elected official) goes to the heart of the claim. Ramaj's subsequent statements in his application and his testimony about his Democratic Party involvement can thus be viewed as attempts to enhance his claim for asylum. *See id.* In a similar vein, Ramaj at various times gave three different years for when he allegedly joined the Balli Kombetar political party—1990, 1994, and 1996.

The IJ also properly highlighted the contradictory reasons that Ramaj gave for why he fled his hometown. Ramaj first mentioned the need to flee in his second application, where he claimed that his resignation from the Democratic Party caused him to be "marginalized" and made him "unable to find work." But he later testified that he fled because of "the killings" that were going on, because he felt that he was at risk of being targeted due to his resignation from the Democratic Party, and because of his objections to the state of political affairs in the country at that time. Ramaj's initial statement that he moved because he was marginalized and unemployed would not likely have supported his claim of persecution, especially because he provided no detail about the alleged circumstances. *See, e.g.*, *Daneshvar v. Ashcroft*, 355 F.3d 615, 625 n.9 (6th Cir. 2004) ("Economic deprivation constitutes persecution only when the resulting conditions are sufficiently severe.").

But the later version of his story, including the looming threat of death at the hands of political opponents, presents a much more compelling tale of possible persecution. *See, e.g.*, *Ouda v. I.N.S.*, 324 F.3d 445, 454 (6th Cir. 2003) (recognizing that death threats can rise to the level of persecution). The IJ did not err in concluding that an inconsistency like this went to the heart of Ramaj's claim. Adding the threat of death to the persecution calculus where before there was only marginalization and difficulty in finding work can be fairly viewed as attempting to embellish the claim for persecution. *See Chen*, 447 F.3d at 472.

In light of these inconsistencies relied upon by the IJ, we hold that the adverse credibility determination does not constitute reversible error. The evidence in the record simply does not compel the conclusion that Ramaj was in fact credible. *See Marku*, 380 F.3d at 986.

### 2. *Even if the IJ erred in his credibility determination, substantial evidence supports the IJ's alternative conclusion that Ramaj was not entitled to asylum*

Adjudicating a request for asylum involves a two-step inquiry: "(1) whether the applicant qualifies as a refugee as defined in [8 U.S.C.] § 1101(a)(42)(A), and (2) whether the applicant merits a favorable exercise of discretion by the Attorney General." *Mikhailevitch v. I.N.S.*, 146 F.3d 384, 389 (6th Cir. 1998) (citation and quotation marks omitted). With respect to the first issue, the term "refugee" is defined as

> any person who is outside any country of such person's nationality or, in the case of
> a person having no nationality, is outside any country in which such person last
> habitually resided, and who is unable or unwilling to return to, and is unable or

unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A).

"The asylum applicant bears the burden of establishing that he or she qualifies as a refugee 'either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution.'" *Ouda*, 324 F.3d at 451 (quoting 8 C.F.R. § 208.13(b)). Once the applicant shows that he or she has suffered from past persecution, the applicant is presumed to have a well-founded fear of future persecution. *Mikhailevitch*, 146 F.3d at 389 (quoting 8 C.F.R. § 208.13(b)(1)). This presumption can be rebutted "only through establishing by a preponderance of the evidence that since the persecution occurred, conditions in the applicant's country 'have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he were to return.'" *Id.* (citation omitted).

In this case, after concluding that Ramaj was not credible, the IJ alternatively determined that even if Ramaj were found to be credible, he "failed to establish a well-founded fear of persecution . . . as is necessary in order to be statutorily eligible for asylum." Ramaj argues that we should reverse this alternative disposition by the IJ because his conclusion is not supported by substantial evidence. An evaluation of this claim must address two alleged errors by the IJ: (1) the refusal to admit and consider the documents contained in Exhibit 8, and (2) whether substantial evidence supports the IJ's conclusion that changed country conditions rebutted any presumption of a well-founded fear of future persecution.

### a.          *Whether the IJ properly excluded the documents contained in Exhibit 8*

Two reasons were provided by the IJ for excluding the Exhibit 8 documents. The first was that there was no verification that the signatures on the original documents were actually those of the persons who allegedly signed the documents (in this case, the signatories were translated as being the Chief of Commissariat of Kurbin and the Doctor in Charge at the Mamurras hospital). This justification by the IJ finds its source in a provision of the Code of Federal Regulations addressing the method of proof of official foreign records in American immigration proceedings where the country of the foreign record's origin is not a party to the 1961 Hague Convention Abolishing the Requirement of Legalisation for Foreign Public Documents. *See* 8 C.F.R. § 1287.6(b). Albania was not a party to the Convention at the time of the hearing. According to the regulations,

> (1) . . . [A]n official record or entry therein, when admissible for any purpose, shall be evidenced by an official publication thereof, or by a copy attested by an officer so authorized. This attested copy in turn may but need not be certified by any authorized foreign officer both as to the genuineness of the signature of the attesting officer and as to his/her official position. The signature and official position of this certifying foreign officer may then likewise be certified by any other foreign officer so authorized, thereby creating a chain of certificates.

> (2) The attested copy, with the additional foreign certificates if any, must be certified by an officer in the Foreign Service of the United States, stationed in the foreign country where the record is kept. This officer must certify the genuineness of the signature and the official position either of (i) the attesting officer; or (ii) any foreign officer whose certification of genuineness of signature and official position relates directly to the attestation or is in a chain of certificates of genuineness of signature and official position relating to the attestation.

*Id.*

The IJ may have erred in excluding the Exhibit 8 documents on this ground. First, subsection (1) above requires an attestation by an authorized officer only where a *copy* of the official record is provided. The record does not reveal whether the documents presented by Ramaj were originals or copies; but if they were originals, the requirement of an attestation does not appear to apply. Furthermore, the "chain of certificates" concept embodied in subsection (1) follows language that makes this an option and not a requirement—"This attested copy in turn *may but need not be* certified . . . ." *Id.* (emphasis added). We need not resolve this issue, however, because the IJ's second reason for not accepting the documents provides a sufficient basis to uphold their exclusion.

According to the IJ, the second reason for rejecting the documents was that they were not properly translated. Any document submitted in an immigration proceeding that is written in a foreign language must be completely translated into English. This requirement is set forth in the Code of Federal Regulations as follows:

> Any foreign language document offered by a party in a proceeding shall be accompanied by an English language translation and a certification signed by the translator that must be printed legibly or typed. Such certification must include a statement that the translator is competent to translate the document, and that the translation is true and accurate to the best of the translator's abilities.

8 C.F.R. § 1003.33.

As stated above, the purported signature of the translator appears on the face of the two Exhibit 8 documents. On the next page, a notary certifies that the signature of the translator is genuine. But nowhere in the two series of documents is there a certification of the translator that is either "printed legibly or typed." All that we see is a faded stamp of some sort and a signature. Even more significant is the absence of a statement by the translator both that he or she was competent to translate the document from Albanian to English and that the translation is correct to the best of his or her ability. These deficiencies in the translation justified the exclusion of the documents. *See Lin v. Gonzales*, 152 F. App'x 475, 482 (6th Cir. 2005) (unpublished) (holding that the IJ properly excluded purported Chinese documents where "the English translations did not contain the certification required by 8 C.F.R. § 1003.33").

### b.      *Whether substantial evidence supports the IJ's conclusion that changed country conditions refuted any presumption of a well-founded fear of future persecution*

As set forth above, the IJ concluded that even if Ramaj's testimony had been accepted, Ramaj would not have a well-founded fear of persecution due to the improvement of conditions in Albania. The testimony and documents presented by Ramaj constituted an attempt to demonstrate that he had suffered from past persecution (citing as evidence the alleged incarcerations and beatings in 1996 and 1997), thus giving rise to a presumption of a well-founded fear of future persecution. *See Mikhailevitch*, 146 F.3d at 389 (quoting 8 C.F.R. § 208.13(b)(1)). If we assume for the sake of argument that the IJ erred in finding that Ramaj's testimony was not credible, and that the IJ further erred in excluding the Exhibit 8 documents, the question would then become whether the resulting presumption of a well-founded fear of future persecution was rebutted by the government. More specifically, we would have to determine whether substantial evidence supports the IJ's conclusion that conditions in Albania have changed to such an extent that Ramaj has no reasonable basis to have a well-founded fear of being persecuted if he were to return.

The IJ discussed two State Department reports that were part of the record: (1) *Albania: Profile of Asylum Claims and Country Conditions* (March 2004), and (2) *Albania: Country Reports*

*on Human Rights Practices-2003* (February 25, 2004). These reports, according to the IJ, evidenced that there are "no indications that the Socialist Party is engaged in a pattern of repression and violent behavior against its opponents." To the contrary, the IJ noted that in recent years a "consensus of observers of international organizations and nongovernment organizations" has developed that "Albanians have been able to exercise freely their right to change their government through democratic means [and] that such a right includes the ability to organize and campaign broadly, free from government interference." Although Ramaj submitted a limited amount of background material to the contrary, the IJ concluded that the incidents described therein were "isolated" and did not "refute the findings of the Department of State."

The country reports relied upon by the IJ constitute substantial evidence supporting the conclusion that country conditions in Albania have improved to the point that any presumption of a well-founded fear of future persecution is rebutted. *See also Macotaj v. Gonzales*, 424 F.3d 464, 465 (6th Cir. 2005) ("As with many similar cases that we have reviewed since the overthrow of the Communist regime in Albania, we find that there is substantial evidence to support the ruling of the immigration judge that, despite whatever political repression Macotaj and his family may have suffered in the past, conditions in Albania have changed to such an extent that Macotaj no longer has reason to fear persecution upon return to his homeland."); *Liti v. Gonzales*, 411 F.3d 631, 640 (6th Cir. 2005) ("Without . . . evidence [corroborating alleged mistreatment of fellow protesters since the Litis left in 1990], we agree with the BIA that in light of the fundamentally changed conditions in Albania, the Litis failed to satisfy their burden of demonstrating a well-founded fear of future persecution if they were to return."). Although this court has on several occasions acknowledged that reports issued by the U.S. Department of State "may be problematic sources on which to rely," *see, e.g.*, *Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2004), we have also adopted the view that such reports are nonetheless "the best source of information on conditions in foreign nations." *Id.* (quotation marks omitted).

Because substantial evidence supports the IJ's analysis on the improved country conditions in Albania, any errors by the IJ on the issues of Ramaj's credibility and his Exhibit 8 documents are harmless. Ramaj attempted to demonstrate that he suffered from past persecution, but any fear of future persecution arising therefrom is not "well-founded" due to the changed country conditions in Albania.

## C.     Withholding of removal and relief under the CAT

Ramaj's request for asylum was also construed by the IJ as a request for withholding of removal and protection under the CAT. An applicant seeking withholding of removal "must show a 'clear probability of persecution,' which is a stricter standard than the 'well-founded fear' standard that applies with respect to applications for asylum." *Ali*, 366 F.3d at 411 (citing *INS v. Stevic*, 467 U.S. 407, 430 (1984)). Because substantial evidence supports the IJ's conclusion that Ramaj is not eligible for asylum, he "cannot satisfy the more stringent standard for withholding of deportation." *See Daneshvar v. Ashcroft*, 355 F.3d 615, 625 (6th Cir. 2004).

To obtain relief under the CAT, Ramaj must show that he would more likely than not be subjected to torture after being deported to Albania. *See* 8 C.F.R. § 1208.16(c)(2) (placing on the applicant seeking relief under the CAT the burden of proving "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal"); *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004) (reciting the same standard). The "more likely than not" burden of proof is similarly higher than the "well-founded fear" burden required to establish a claim for asylum, so that substantial evidence also supports the rejection by the IJ of Ramaj's CAT claim. *See Elezaj v. Gonzales*, 163 F. App'x 358, 361 (6th Cir. 2005) (holding that if an applicant fails to meet the standard for asylum, he "*a fortiori*" fails to meet the requirements for withholding of removal and relief under CAT).

## III.  CONCLUSION

For all of the reasons set forth above, we **DENY** the Ramajs' petition for review.