NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0609n.06

No. 08-4135

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Aug 27, 2009**
LEONARD GREEN, Clerk

EVIS CIKA,                                      )
                                                )
          Petitioner,                           )        ON PETITION FOR REVIEW
                                                )        OF AN ORDER OF THE BOARD
     v.                                         )        OF IMMIGRATION APPEALS
                                                )
ERIC H. HOLDER, JR.,                            )            **O P I N I O N**
Attorney General,                               )
                                                )
          Respondent.                           )
_____ )

**Before: BOGGS, ROGERS, and WHITE, Circuit Judges.**

**WHITE, Circuit Judge.** Petitioner Evis Cika (Cika) seeks review of an order of the Board

of Immigration Appeals (BIA) denying his motion to remand to the Immigration Judge (IJ) and

dismissing his appeal. We DENY the petition for review.

**I**

On February 1, 2006, the Department of Homeland Security (DHS) served Cika with a

Notice to Appear in removal proceedings pursuant to section 240 of the Immigration and Nationality

Act (INA). The government alleged that Cika, a native and citizen of Albania, was an alien present

in the United States who had not been admitted or paroled, but instead "arrived in the United States

at or near [an] [u]nknown place, on or about an unknown date," and was "not then admitted or

paroled after inspection by an Immigration Officer." The government charged that Cika was subject

1

to removal pursuant to section 212(a)(6)(A)(i) of the INA, 8 U.S.C. § 1182(a)(6)(A)(i), which provides that "[a]n alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible."

An initial hearing was held before an immigration judge on September 19, 2006. Cika admitted that he is not a citizen of the United States and is a native and citizen of Albania, but disputed the allegation that he had not been admitted or paroled into the United States. Cika testified that he previously lived in Tirana, Albania, and that he entered the United States on April 24, 2005 in Miami with a Greek passport that he purchased in Albania for $12,000.[1] He did not remember the name on the Greek passport. He testified that the smuggler who brought him into the United States held onto the Greek passport at all times,[2] and that upon arrival at the immigration checkpoint, the authorities looked through the Greek passport and "inspected" Cika, though Cika did not speak at any point to the immigration authorities. He further testified that "[t]he guy that brought me here took [the Greek passport], he didn't leave anything, he took my passport, my ticket, and everything . . . ." Cika could only identify the smuggler who brought him to the United States by his first name.

---

[1] He was also carrying his own Albanian passport at the time. According to his own account, he was also asked why he did not use his Albanian passport to travel to the United States, Cika testified that he had applied for a visa from the U.S. Embassy in Tirana in approximately February 2004, but was denied.

[2] Cika was asked how he knew it was a Greek passport if he never handled it himself. He answered that the smuggler said they were going to "come like a Greek."

Cika expressly conceded his removability from the United States, but not under section 212(a)(6)(A)(i).

At the conclusion of the hearing, the government discussed its intent to amend the charge in the Notice to Appear, and Cika's counsel informed the IJ that Cika's wife was a United States citizen and had filed a Form I-130 based on their marriage, on which the DHS's decision was pending.[3] The IJ scheduled another hearing for March 6, 2007.

At the second hearing, the government informed the court that it had decided not to amend the charge to allege that Cika was admitted fraudulently because it "do[es] not believe [Cika] has provided any evidence to establish his time, place, and manner of entry."[4] Cika's counsel stated that the I-130 remained pending, that "[w]e are purs[u]ing adjustment of status," and that Cika had no other forms of relief. The IJ initially stated that after hearing Cika's prior testimony regarding the time, place, and manner of entry, he determined that Cika "has no relief" and a removal order would

---

[3]A Form I-130, entitled "Petition for Alien Relative," is not filed by the alien (who is considered the "beneficiary"), but rather by a relative who is a U.S. citizen or lawful permanent resident.

[4]At one point, Cika's counsel characterized the government's intention to amend the Notice to Appear as "an agreement," but the IJ questioned this, saying that he "didn't know that there was an agreement to do anything . . . . [I] was under the impression that, that is what [government's counsel] was going to be doing before today's hearing. . . . But the bottom line is, that they would like, for whatever reason, not to do it." Later, the IJ characterized the government's decision as a "conscious decision" and a "tactical matter"—that "given the evidence presented," the government decided Cika "has not established the time, place, and manner of his entry, and there [sic] he is considered to be entry without inspection." Cika does not argue that the government had an obligation to amend the charge in the Notice to Appear.

issue.[5] Yet given the government's decision to proceed on the charge in the original Notice to Appear, the IJ allowed that "[i]f [Cika] wants to claim that he came with a . . . fraudulent passport, I will set this . . . over for a merits hearing . . . . I will go back and listen to the tape. He can present further evidence as to how he got to the United States, I will make a finding on his removability, [and] he can take appeal from whatever the Court's decision is." The IJ reminded Cika that he would have the burden of demonstrating the time, place, and manner of his entry, which the IJ cautioned seemed "pretty difficult for him to do" given his prior testimony.

On May 11, 2009, a third hearing was held so that Cika could present further evidence to support his contention that he was inspected and admitted into the United States. Cika's counsel again asked for a continuance to allow for the I-130 to be processed. The IJ rejected this request, expressing his doubts about petitioner's ability to prove the bona fides of his marriage and noting that "even if we continued [the hearing], he cannot adjust, if you believe his testimony, adjust here in the United States, he is going to have to leave. . . . Because he was not lawfully admitted to the United States." The IJ then proceeded to hear additional testimony from Cika and his wife.

Cika testified that he was served with a Notice to Appear on February 1, 2006, and that he was married after that date. Cika was asked when he met his wife; he initially answered that "[i]t was the end of April, and beginning of May" in "2006," subsequently testified that he met her "probably . . . the beginning of May. I am sorry, 2005," and later testified that he "met [his] wife at [sic] 2006 . . . [i]t could be May, 2006." Cika testified that he came to the United States on April

---

[5]The IJ offered the option of voluntary departure, but Cika would not admit that he entered without inspection or concede his removability under the charge stated in the Notice to Appear.

24, 2005, and answered affirmatively when asked if he met his wife "about a year after [he] came" to the United States. Cika testified that he only knew his wife for "[t]hree months" before they married.

Cika was also asked about a lease he and his wife signed and dated January 1, 2006, when, according to certain portions of his testimony, he met her in April or May of 2006. Cika testified that "[t]his is the first lease where I lived with her[] from June, 2006, and the address is 365 East Gate Street. . . . I lived there before [June], but she moved here on [sic] June." Later, Cika attempted to explain that his wife's name was on a lease that began in January of 2006 because "she coming in, and going out." He testified that the lease was dated January 1, 2006 because his friend used to live there but moved out and let Cika and his wife live there together.

Cika's wife also testified. Consistent with portions of her husband's testimony, she said that they married on July 10, 2006. Unlike her husband, however, she testified that they met "in April when he came here, it was a little after he came here we met." When asked to clarify the year, she testified they met in 2005 and got married the next year. When informed that her husband had testified that he met her in May of 2006, she explained that "he must be confused, we definitely met in '05. . . . I know when we met." And when informed that her husband had testified they only met a few months before they married, she testified, "No, we got married a year after we met, and that is what I am saying, maybe he got the dates and year mixed up . . . ." As for the lease, she testified that she signed the lease for the home at 365 Gate Street and lived there for "[a] couple months maybe." She estimated she "officially" moved in in March or April of 2006. Asked why the lease started January 1, 2006, while she and petitioner were only living there for a couple of months, she

answered, "I'm not sure, sir, that is what the guy drew up, he was there prior to when we moved in, like a month and [a] half . . . ." When questioned by the IJ about why her married name was on the lease, Mrs. Cika initially testified that she did not sign the lease while she was married to petitioner, but then acknowledged that she did not sign a lease when she moved in and instead signed the lease "[w]hen we were told that we needed to bring all of our documents to show that we lived together"—that she "signed it after I was married, and when we went to file the I-130 form we had to have all our documents . . . ."

After petitioner and Mrs. Cika testified, the IJ allowed each side to argue about petitioner's request for a continuance pending disposition of the I-130 request. Cika's counsel stated that there is substantial evidence of a marital relationship and asked that the court continue the removal proceedings so that the DHS could adjudicate the I-130. The government opposed the motion to continue, arguing *inter alia* that Cika entered the United States without being inspected and admitted, making him statutorily ineligible for adjustment of status, and also that Cika's marriage was not bona fide. The court expressed reluctance to grant an open-ended continuance, and denied the request for a continuance because Cika had not shown that he was lawfully admitted to the United States. The IJ noted that Cika could not present his passport, concluded that the Cikas' testimony conflicted in a number of respects, and observed that the lease offered as evidence by Cika was dated before they were married yet signed by Cika's wife using her married name. "[H]e has not proved the time, place, and manner of his entry, therefore he is removable as being present without being admitted or paroled . . . . So he cannot adjust his status even if he got the I-130 approved, he would have to leave." The IJ also questioned Cika's desire to delay "to try to get an I-130 approved

6

that has in it a fraudulent document," apparently doubting Cika's wife's chances for success with the I-130 though observing that "[s]tranger things have happened."

Nevertheless, notwithstanding the IJ's having held a hearing, expressed his conclusions about petitioner's testimony, and determined that Cika failed to prove he was admitted, the IJ still did not enter an order of removal. Instead, because Cika's counsel asserted that other evidence could prove Cika's entry, the court scheduled yet another hearing to allow Cika the opportunity to present additional testimony. The fourth and final hearing, at which the IJ heard testimony from three witnesses, was held on May 31, 2007. Testa Xheja, Cika's cousin, testified that Cika's mother called her on April 22, 2005 to say that Cika would be coming to the United States, that Cika himself called her on April 24, 2005 to say that he arrived in Miami and used a falsified passport, and that he called her on April 26 from Columbus, Ohio for a ride from the bus station. Elidon Hizmo, another cousin, testified that he met Cika when he picked him up from the bus station in Columbus on April 24th or 25th, and that while driving back Cika told him that he had landed in Miami and that Cika's "mom, his parents" bought him a Greek passport for $13,000.[6] The final witness was Armando Hasani, a friend of Hizmo, who testified that he met Cika when he accompanied Hizmo to pick him up from the bus station. Hasani testified that he overheard Cika's conversation with Hizmo on the ride back from the bus station, and that Cika told Hizmo that he entered the United States in Miami with a Greek passport.

---

[6]Hizmo also testified that Cika and his wife began dating approximately two months after Cika's arrival in the United States and that they married on July 10, 2006. He testified that Cika moved into the same home with his wife in August of 2006, after they were married.

After the witnesses testified, the court again considered Cika's request for a continuance pending processing of the I-130. The court informed Cika that an order of removal would enter and he would have to attempt to adjust his status outside of the United States "even if the I-130 gets approved." Nevertheless, the IJ asked Cika whether he would accept a continuance with the proviso that if the I-130 were not approved by December 30, 2007, a final order of removal would enter and Cika's right to appeal would be waived. Cika would not accept such a continuance, instead wanting what the court characterized as an "open-ended delay" lasting until the adjudication of the I-130.

The IJ proceeded to issue his decision. He stated that Cika's nationality is not at issue because he conceded that he is not a citizen or national of the United States and that he is a native or citizen of Albania. The court recounted Cika's testimony that, *inter alia*, "he entered the United States at Miami, Florida on April 24, 2005 with a Greek passport that he had 'bought' in Albania for $13,000," and that he "did not recall the name on the passport." The court observed that Cika's testimony and that of his wife were "inconsistent . . . about various facets of the marriage"—"they cannot even decide when they met each other, let alon[e] how long they knew each other before the marriage." The court also recalled that after the third hearing, it "gave [Cika] another continuance so that he could attempt to corroborate his testimony that he came to the United States with a fake, phony, fraudulent passport, a Greek passport, at least one that was not his." In discussing the witnesses who testified at the fourth hearing, the IJ noted that two of them were Cika's relatives and that two of them contradicted Cika's testimony about when he met his wife.

The IJ also looked to the documentary evidence Cika filed with the court. It observed, *inter alia*, that Cika's wife's I-130 did "not indicate that [Cika] came to the United States with a

fraudulent Greek passport," but rather the I-130 stated that Cika "came to the United States with a false green card, he did not have a[n] I-94[.]"[7] The IJ also observed that attached to the I-130 was a residential lease agreement for 365 Gate Street for the period of January 1, 2006 to January 1, 2007, which the IJ found to be "obviously fake, phony, and fraudulent."

The IJ found that Cika's testimony conflicted with others' testimony and in certain respects was "diametrically opposed." To the IJ, this was "important for two reasons": because it "demonstrates [petitioner's] testimony that he came using a fake, phony Greek passport cannot be relied upon," and because the Cikas' odds of succeeding with the I-130 petition and demonstrating that their marriage was bona fide was doubtful. The IJ also recognized that regardless of whether the I-130 would be approved, Cika could not adjust his status in the United States because he did not show he was lawfully admitted. The IJ observed that because Cika conceded his alienage, he had the burden of proof; the court quoted 8 C.F.R. § 1240.8(c), which provides that "[i]n the case of a respondent charged as being in the United States without being admitted or paroled, the [government] must first establish the alienage of the respondent," and that "[o]nce alienage has been established, unless the respondent demonstrates by clear and convincing evidence that he or she is lawfully in the United States pursuant to a prior admission, the respondent must prove that he or she is clearly and beyond a doubt entitled to be admitted to the United States and is not inadmissible as charged." The IJ determined that Cika "has not come anywhere close to demonstrating that" and

---

[7]Form I-94 is the Arrival-Departure Record. 8 C.F.R. § 264.1. "Most non-immigrant aliens are issued I-94s on their arrival in the United States, are required to keep their I-94s with them at all times, and are subject to criminal penalties for failing to do so." *See Rajah v. Mukasey*, 544 F.3d 427, 440 (2d Cir. 2008) (footnote omitted).

thus meeting his burden. Rather, the Court found it could "only conclude that he entered the United States by sneaking into the United States; that he was not admitted or paroled after inspection by an [i]mmigration officer," but "just snuck into the country at a time or place other than that designated by the Attorney General." Concluding that "[t]he bottom line of all of the evidence is that [Cika's] removability has been established by clear and convincing evidence," the IJ ordered that Cika be removed from the United States to Albania on the charge contained in his Notice to Appear and denied the request for an "open-ended continuance" to seek "an adjustment which may never occur[] even if the I-130 is approved."

Cika appealed the IJ's ruling to the BIA. He argued that the IJ's decision was not supported by substantial evidence and that he was eligible for an adjustment of status as one who was inspected and admitted but entered the United States fraudulently. Cika initially argued that not granting a continuance to allow for the adjudication of the pending I-130 was an abuse of discretion, and that the matter should be "remanded with instructions to grant a continuance." While the appeal was pending, the I-130 was approved, and Cika subsequently requested that the BIA remand to the IJ to consider his request for an adjustment of status. The government opposed this, citing INA § 245(a) and arguing that Cika cannot adjust his status in the United States because "[a] prerequisite to adjustment of status is a prior inspection and admission or parole into the United States," which the IJ found Cika had not proven.

On August 20, 2008, the BIA issued its opinion upholding the IJ's disposition. The BIA noted that Cika "appealed from an Immigration Judge decision finding him ineligible to adjust his status[] and denying his request for a continuance to await the outcome of a visa petition filed on his

behalf," and observed that the visa petition subsequently "has been approved," causing Cika to request remand so that he could apply to adjust his status. Denying Cika's request to remand, the BIA stated that "[a]s noted by the [IJ], . . . [Cika] is ineligible to adjust his status in the current proceedings," and "agree[d] with the [IJ] that [Cika] has not shown he is able to adjust his status in the current proceedings, despite his approved visa petition." The BIA took note of Cika's argument that he entered the United States with a fraudulent passport, but recognized that Cika "was charged with being present in the United States without being admitted or paroled." It quoted section 245(a) of the INA, 8 U.S.C. § 1255(a), which provides that the status of an alien "who was inspected and admitted or paroled into the United States" may be adjusted, but determined that "as found by the Immigration Judge" Cika "failed to provide sufficient proof of the time, place and manner of his entry." The BIA observed that Cika "testified that he entered with a passport other than his own, and presented some witnesses to that effect." However, the BIA found "insufficient cause to disagree with the Immigration Judge's conclusion that [Cika] failed to demonstrate that he did not enter the United States without inspection." In dismissing the appeal, the BIA concluded "that [Cika] was properly found to be removable. He has failed to establish by clear and convincing evidence that he is lawfully present in the United States, nor has he demonstrated that he is clearly and beyond doubt entitled to be admitted."

Cika filed a timely notice of petition for review with this court. We have jurisdiction under 8 U.S.C. § 1252. Another panel of this court ordered that petitioner's removal be stayed pending our review of his petition.

11

**II**

"Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination. To the extent the BIA adopted the immigration judge's reasoning, however, this Court also reviews the immigration judge's decision." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (citations omitted).

In removal proceedings, this court reviews legal conclusions de novo and factual findings under the "substantial evidence" standard. *See Ndrecaj v. Mukasey*, 522 F.3d 667, 672 (6th Cir. 2008); *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006). Under the substantial evidence standard, "findings of fact are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)). "To reverse[,] . . . we must find that the evidence 'not only supports a contrary conclusion, but indeed *compels* it.'" *Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006) (quoting *Yu*, 364 F.3d at 702 (emphasis in the original)).[8]

**A.**

Cika first argues that "[a]n alien who is inspected and admitted to the U.S. but used a false passport during that inspection and admission is eligible for adjustment of status based upon his marriage to a U.S. citizen if he obtains a waiver of the use of that false passport" under Section 212(i) of the INA, 8 U.S.C. § 1182(i). Section 212(i) states in pertinent part that "[t]he Attorney

---

[8]Thus, Cika's contention that "[t]his [c]ourt may reverse where it finds that a reasonable fact[]finder could have reached a different result below" is profoundly mistaken.

General may, in the discretion of the Attorney General, waive the application of clause (i) of subsection (a)(6)(C) of this section in the case of an immigrant who is the spouse . . . of a United States citizen or of an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the refusal of admission to the United States of such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such an alien . . . ." 8 U.S.C. § 1182(i)(1). The provision of the INA to which section 212(i) is referring is section 212(a)(6)(C)(i), which states that "[a]ny alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible." 8 U.S.C. § 1182(a)(6)(C)(i).

Cika's argument is misguided. As the government aptly points out, Cika is impermissibly challenging the provision of the INA under which he was charged. The Notice of Removal did not charge Cika with being subject to removal under section 212(a)(6)(C)(i) of the INA, but rather charged that he was subject to removal under section 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), which provides that "[a]n alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible." Although the government had expressed its intent after the first hearing to amend the Notice to Appear to charge that Cika sought admission to the United States on the basis of fraud, the government then made a "conscious decision" not to do so and to maintain instead that Cika was removable under section 212(a)(6)(A)(i) because, having conceded that he is not a citizen or national of the United States and that he is a native or citizen of Albania, Cika had the burden of

13

proving the time, place, and manner of his entry into the United States. The BIA noted that an alien "who was inspected and admitted or paroled into the United States" may have his status adjusted by the Attorney General, 8 U.S.C. § 1255(a), but concluded that Cika was ineligible to adjust status because he did not demonstrate that he was inspected when he entered the United States—that there was "insufficient cause to disagree with the [IJ]'s conclusion that [Cika] failed to demonstrate that he did not enter the United States without inspection."

The BIA was correct that the provision in the INA allowing for adjustment of status applies only to aliens who were "inspected and admitted or paroled into the United States," 8 U.S.C. § 1255(a). An exception to this provision once allowed an alien "physically present in the United States" who had "entered the United States without inspection" to apply for adjustment of status if he is the beneficiary of a petition for classification, such as an I-130. *See* 8 U.S.C. § 1255(i); *see also Ramirez-Canales v. Mukasey*, 517 F.3d 904, 909, 911 (6th Cir. 2008) (approving of the BIA's determination that adjustment of status pursuant to section 1255(i) is available to aliens who are inadmissible under 8 U.S.C. § 1182(a)(6)(A)(i) (citing *In re Briones*, 24 I & N Dec. 355, 365 (BIA 2007))). However, such a petition for classification must have been filed "on or before April 30, 2001," and even then, the alien must have been "physically present in the United States on December 21, 2000." *See* 8 U.S.C. § 1255(i); *see also Ramirez-Canales*, 517 F.3d at 909 (discussing Congress's reasons for enacting § 1255(i) and observing that Congress included a "sunset provision" that was "effectively extended multiple times"). As the I-130 in this case was filed years after the April 2001 deadline, this exception does not apply to Cika.

14

**B.**

Next, Cika argues that the decision below was not supported by substantial evidence because it ignored corroborating evidence regarding his entry into the United States. Because the evidence does not "compel" a conclusion contrary to the BIA's determination that "as found by the [IJ], [Cika] has failed to provide sufficient proof of the time, place and manner of his entry" into the United States, we must affirm. Although Cika's story is plausible, he put forward little evidence to satisfy his burden to show that he entered the United States in Miami in 2005 using a fraudulent Greek passport. He could not recall the name on the passport and did not present any alien registration forms, copies of which are retained by the immigration authorities, in an effort to corroborate his account. He did not present any banking or financial documents that would confirm the substantial payment purportedly made to his smuggler. The only evidence he put forward consisted of testimony by third parties who said that Cika told them that he entered the United States in this manner, and his own Albanian passport that was not stamped by the United States. The latter demonstrates that he was not admitted and paroled with his own passport, but does not support that he was admitted and paroled with another passport. In sum, Cika failed to demonstrate by "clear and convincing evidence" that he is lawfully in the United States pursuant to a prior admission and did not prove that he is not inadmissible as charged. *See* 8 C.F.R. § 1240.8(c).

Cika maintains that because the DHS approved his wife's I-130 submission, the BIA's statement that it had "insufficient cause" to disagree with the IJ's factual analysis was not supported by substantial evidence. We disagree. The BIA correctly interpreted the governing law in finding

that Cika is ineligible to adjust his status notwithstanding any successful I-130 petition.[9]  The BIA did not address the bona fides of the Cikas' marriage as a basis for granting or denying relief, and thus neither do we.  *See INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002).  A decision by the DHS that the marriage is bona fide does not necessarily undermine the determination that Cika failed to prove his entry into the United States.  The BIA concluded that "as found by the [IJ]," Cika "failed to provide sufficient proof of the time, place and manner of his entry."[10]  Even if others are able to draw different conclusions from the evidence, we cannot say that "any reasonable adjudicator would be compelled to conclude" to the contrary.  *See* 8 U.S.C. § 1252(b)(4)(B).

## C.

Cika also argues that the IJ abused its discretion in deciding not to grant Cika a continuance pending the DHS's determination on his wife's I-130 application.  Although this point is arguably moot given that the I-130 was approved, we address it nonetheless.  An immigration judge "may" grant a continuance for "good cause."  8 C.F.R. § 1003.29.  We review the denial of a petitioner's motion for a continuance under an abuse-of-discretion standard.  *Abu-Khaliel v. Gonzales*, 436 F.3d 627, 634 (6th Cir. 2006).  "An abuse of discretion occurs if 'the denial . . . was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination.'"  *Ilic-Lee v. Mukasey*, 507 F.3d 1044, 1047 (6th Cir. 2007).

---

[9]Indeed, the "Notice of Approval of Relative Immigrant Visa Petition" itself states in part that this approval "gives no assurance that the beneficiary will automatically be found eligible for visa issuance, admission to the United States or adjustment to lawful permanent residence status."

[10]Although the IJ doubted the ultimate success of the I-130 filing, his analysis did not rely on his estimation of Cika's wife's I-130 chances.

Here, there was no abuse of discretion. Although other courts have found an abuse of discretion when the immigration court "gave no reason for denying the continuance" or "gave an arbitrary reason," it can be rational to conclude—as here—that petitioner did "not provide any evidence that suggested a likelihood of success on the merits." *Id.* at 1047-48. Even though the I-130 petition was eventually successful in this case, that does not mean that the IJ did not give a rational reason for its decision. Moreover, this is not a case in which the IJ "had little reason to believe [petitioner] would not be able to obtain an adjustment of status." *See id.* at 1048 (distinguishing *Badwan v. Gonzales*, 494 F.3d 566 (6th Cir. 2007)).

**D.**

Finally, Cika concludes his brief to this court by saying that "once the I-130 was approved as reflected in the attachment to Cika's July 9, 2008 motion to remand, the Board clearly should have remanded the matter to allow Cika to pursue his adjustment of status before the immigration court." We have jurisdiction to review the denial of a motion to remand from the BIA to an IJ, *see Abu-Khaliel*, 436 F.3d at 631, and we review such a denial for an abuse of discretion, *see Sarr v. Gonzales*, 485 F.3d 354, 363 (6th Cir. 2007). The BIA did not abuse its discretion in declining to remand. As the BIA correctly noted, the approval of the I-130 does not disturb the determination that Cika will still be unable to adjust his status, given the basis for his removal and his failure to show he was "inspected and admitted or paroled into the United States."

**III**

We DENY the petition for review. The stay of removal that this court previously granted in this petition is VACATED.