HELENE N. WHITE, Circuit Judge,
dissenting.
Because I believe that the government did not establish by a preponderance of the evidence that changed country conditions in Cote D’Ivoire obviated Kaba’s fear of future persecution, I respectfully dissent.
In considering the BIA’s dismissal of Kaba’s appeal from the IJ decision denying Kaba’s asylum claim, we review the BIA’s legal determinations de novo and its factual conclusions for substantial evidence. Sanusi v. Gonzales, 474 F.3d 341, 345 (6th Cir.2007). Under the substantial evidence standard, the BIA’s findings are “conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.” Id. (citations omitted).
The BIA did not address whether Kaba had established past persecution, but instead determined that assuming Kaba had faced past persecution, there was a funda *486 mental change of circumstances that rebutted the presumption of future persecution. To reach that conclusion, the BIA agreed with the I J’s holding that,
[T]he end of the civil war in the Ivory Coast, the intervention of the United Nations, as well as the death of the gendarmes that allegedly detained the respondent in 2002, establish that the respondent’s fear of returning to the Ivory Coast is no longer objectively reasonable.
The BIA further found that “[w]hile the Department of State Country Reports and other objective evidence contained in the record do discuss the overall poor conditions in the Ivory Coast, none of this evidence specifically discusses the respondent.” Accordingly, the BIA held that Kaba had not established a well-founded fear of future persecution.
Because for purposes of this appeal Kaba is entitled to a presumption that he had a well-founded fear of future persecution,[1] the burden is on the government to establish by a preponderance of the evidence that changed country conditions in Cote D’Ivoire obviate that fear. Vincent v. Holder, 632 F.3d 351, 356 (6th Cir.2011). Kaba argues that the end of the civil war, the intervention of the United Nations, and the death of the gendarmes who detained him are each insufficient to rebut this presumption.
The third reason cited by the BIA— that the gendarmes who detained Kaba in 2002 were subsequently killed by rebels— clearly cannot support a finding that Kaba no longer had a well-founded fear of persecution. Kaba never alleged that he was personally being targeted by specific individuals, but rather that the government’s security forces were targeting Dioulas as a group because the government believed Dioulas were members of rebel groups, and that Kaba was persecuted on account of that belief. Accordingly, that the specific individuals who detained him may have died has no bearing on whether Kaba continues to have a well-founded fear of persecution by government security forces on account of his status as Diou-la.
The first two reasons cited — the end of the Civil War and involvement of the United Nations — theoretically offer greater support that the country conditions have fundamentally changed. However, on the basis of the 2008 U.S. State Department Human Rights Report, upon which the government primarily relied to argue that the country conditions had changed, it is a close case whether the government could have carried its burden to rebut the presumption to which Kaba was entitled. Although the report notes that the President and rebels signed the Ouagadougou Political Agreement (OPA) in 2007 to hold elections and dismantle the “zone of confidence” dividing north and south Cote D’Ivoire, which resulted in some improved civil administration and the distribution of birth certificates, the report notes that *487 “implementation of other key tenets of the OPA — including disarmament of armed factions and determination of citizenship— remained incomplete.” The report also noted that “[t]he government’s human rights record improved slightly during the year but continued to be poor,” and that “[s]ecurity forces continued to commit extrajudicial killings with impunity, and government militia groups were responsible for killings, disappearances, and harassment. These crimes often went unreported or underreported due to fear of reprisals.” The report specifically attributes some of the violent crimes to progovernment militia groups and gendarmes, which are the same groups, led by the same government leaders, that Kaba alleged imprisoned him in 2002.[2] Although the report does not mention Kaba’s ethnic group by name, it does note that “police officers continued to extort bribes from persons of northern origin or with northern names,” such as Kaba. And nothing in the report suggests that Kaba’s ethnic group had ceased to be a target, or that his town had become peaceful. See Berishaj v. Ashcroft, 378 F.3d 314, 327 (3d Cir.2004) (agreeing with every Court of Appeals that has so far considered the issue, that “evidence of changed country conditions can successfully rebut an alien’s fear of future persecution based on past persecution only if that evidence addresses the specific basis for the alien’s fear of persecution; generalized improvements in country conditions will not suffice as rebuttals to credible testimony and other evidence establishing past persecution”), abrogated on other grounds, Nbaye v. Attorney General of United States, 665 F.3d 57, 59-60 (3d Cir.2011).
Kaba argues that the OPA has had virtually no effect on the conditions in Cote D’Ivoire. In fact, an article that was included in the administrative record notes that a UN Panel was warned of escalating violence “as parties are rearming despite an UN arms embargo imposed since 2004.” The BIA cited Ramaj v. Gonzales, 466 F.3d 520, 531 (6th Cir.2006), in rejecting Kaba’s contention that the presumption of future persecution cannot be rebutted solely on the basis of a Department of State Country Report. However, in Ramaj, the applicant sought asylum based on persecution in Albania on the basis of various political activities, but an IJ found that the country reports established that in recent years a consensus had developed among international and nongovernmental organizations that “Albanians have been able to exercise freely their right to change their *488 government through democratic means and that such a right includes the ability to organize and campaign broadly, free from government interference.” Id. at 523, 531. This Court found that those reports constituted substantial evidence supporting the conclusion that the country conditions had improved to the point of rebutting a presumption of a well-founded fear of future persecution. Id.
Here, the country reports are not nearly as clear-cut. Although the parties to the conflict signed an agreement to hold elections, the reports did not establish that the parties to the conflict had disarmed or disbanded. On the other hand, the government is correct to assert that the civil war of 2002-03 had ended and the United Nations had deployed peacekeepers to the country in 2004. But on the basis of reports of continued violence committed by the same forces, and directed towards the same rebel groups towards which it was directed in 2002, it is more than likely that substantial evidence does not support the conclusion that the government has established that the changes in the conditions are so fundamental that they are sufficient to rebut the presumption that Kaba’s fear is well-founded.
Accordingly, I would vacate the BIA’s finding that Kaba has not established a well-founded fear of future persecution, and remand to the BIA to rule on whether Kaba was credible and whether he established past persecution.

. Because the BIA proceeded on the assumption that Kaba suffered past persecution, we must proceed on that basis on appeal. The logic of this position is self-evident. If a lower tribunal concedes an issue in a party’s favor, the appellate tribunal cannot deny the party the benefit of that concession in deciding the issues on appeal. Hypothetical or not, our review proceeds on the assumption that Kaba suffered past persecution. Further, the statute provides that where there is past prosecution, the petitioner enjoys the presumption of a well-founded fear of future prosecution. See 8 C.F.R. § 1208.13(b)(1). That presumption does not disappear where the past persecution is assumed arguendo. The BIA recognized this and found that the presumption had been overcome. The only issue in this appeal is whether that finding is adequately supported by the record. Hence, in this appeal, Kaba is entitled to the presumption of a well-founded fear of future prosecution.

. The government of Cote D’Ivoire was led by former President Gbagbo at the time of the civil war in 2002 as well through the rest of the decade. He was arrested in April 2011, a fact which may have bearing on the motion to reopen, but which this Court may not consider in evaluating whether the BIA erred in its initial dismissal of the appeal. Lin v. Holder, 565 F.3d 971, 978-79 (6th Cir.2009) (holding that this Court may not take judicial notice of facts, including country reports, outside the administrative record). For the same reason, the supplemental cases submitted by the government, which stand for the proposition that a presumption of past persecution may be rebutted in political persecution cases by a showing that the persecutor is no longer is in power, are also not relevant. • Even if this Court could take judicial notice of the fact that Gbagbo was arrested, those cases deal with political persecution, not ethnic persecution, and in any event do not establish a per se rule that a leader’s removal from power rebuts a presumption of future persecution. See e.g. Trifoni v. Holder, 351 Fed.Appx. 19, 23 (6th Cir.2009) (”[T]he Government can often rebut the presumption in political persecution asylum cases by showing that the applicant’s persecutors are no longer in power.”) (emphasis added); Chieh v. Holder, 411 Fed.Appx. 800, 803 (6th Cir.2011) (upholding the BIA’s finding that Charles Taylor’s "removal from power [in Liberia], and the salutary changes flowing from the ouster, established that [petitioner’s] fear of future persecution ... is not well founded”).